[Crim. No. 989. Second Appellate District, Division Two.—October 2, 1923.]

THE PEOPLE, Respondent, v. J. C. HUBBARD, Appellant.

[1] CRIMINAL LAW—MURDER—ACCIDENTAL SHOOTING—EJECTMENT OF DECEASED FROM PREMISES—RIGHT TO USE FORCE—REFUSAL TO GIVE REQUESTED INSTRUCTION—PREJUDICIAL ERROR.—In a prosecution for the killing of one caused by a pistol shot, claimed by the defendant to have been accidentally discharged when he was endeavoring to eject the deceased from a house occupied by the defendant and a woman with whom he (the defendant) was living in a meretricious relation, defendant's claim that the shooting was an accident not being directly contradicted by any evidence in the case and being at least consistent with all that was testified to by the only other living eye-witness, the woman, it was prejudicial error for the trial court to refuse to instruct the jury at defendant's request to the effect that if they believed that defendant had rented said house and was occupying the same as a tenant, then he had a right to exclude the deceased therefrom, and that if they found that defendant ordered the deceased to leave the house and that the latter refused to do so, the defendant had a right to use such reasonable force as may have been necessary to eject the deceased from the premises, even though the defendant and said woman were living in the house in an illicit relationship.

[2] ID.—EJECTMENT OF DECEASED — RIGHT OF DEFENDANT — SELF-DEFENSE.—Though the defendant had rented the premises in ques-

tion for the occupancy of himself and his paramour, he, and he only, was the legal tenant; and when deceased, uninvited by defendant, crossed the threshold, defendant, who was rightfully in possession of his rented premises, had the right, notwithstanding his paramour's invitation to deceased to enter, to request the deceased to leave, and upon the latter's refusal to go to use such force as might be reasonably necessary to remove him, after allowing a reasonable time for his departure.

[3] Id.—Defense of Habitation—Degree of Force.—The person who is acting in defense of his habitation must first use moderate means before resorting to extreme measures; but he may resist force with force, increasing it in the ratio of the intruder's resistance, without measuring it in golden scales; and whether he has used excessive force or not is a question for the jury.

[4] Id.—Retreat—Self-defense.—A person assailed in his own house is not bound to retreat from the house to avoid violence, even though a retreat may safely be made. And if the intruder resists his ejection and assaults the lawful occupant, the latter need not retreat, but, in protecting his person, he may, if necessary, intentionally take the intruder's life if he has reason to believe, and does believe, that his own life is in danger or that he is in danger of receiving great bodily harm.

[5] Id.—Use of Pistol—Misdemeanor.—In such prosecution, assuming, without conceding that it was unlawful for defendant to "bluff" deceased by shaking the pistol up and down and pointing it to the ground in the presence of deceased, still defendant's act amounted to no more than a misdemeanor under section 417 of the Penal Code and not to a felony.

[6] Id.—Murder of Second Degree—Instruction.—In such prosecution, the trial court correctly charged the jury that if the killing "is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, . . . this is murder of the second degree."

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Paul J. McCormick, Judge. Reversed.

4. Right of person assaulted on own premises to repel attack without retreating, notes, 5 Ann. Cas. 999; 15 Ann. Cas. 51.

Homicide in defense of habitation, notes, 21 Ann. Cas. 721; 25 A. L. R. 508; 67 L. R. A. 545; 45 L. R. A. (N. S.) 71.

5. Wanton or reckless use of firearms without express intent to inflict injury, notes, 5 A. L. R. 603; 23 A. L. R. 1554.

6. Homicide in the commission of an unlawful act, notes, 63 L. R. A. 353; 45 L. R. A. (N. S.) 219.

The facts are stated in the opinion of the court.

Ticknor, Carter & Webster for Appellant.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

FINLAYSON, P. J.—Defendant was charged with the murder of one Dennis Cope. He was convicted of murder in the second degree and now appeals from the judgment and from an order denying his motion for a new trial.

The killing, which was admitted, was caused by a bullet from defendant's pistol, discharged in the course of a scuffle while defendant was endeavoring to eject Cope from a house occupied by the defendant and one Lillian Hopkins, a young woman with whom he was living in a meretricious relation. Defendant testified that the discharge of the pistol was accidental and unintentional. His principal contention here is that the trial court erred in refusing to give an instruction, presently to be quoted, which would have advised the jury that he could rightfully use all force reasonably necessary to eject Cope from the premises.

The main facts in the case are substantially as follows: On June 18, 1922, defendant, under the name of M. L. Hopkins, rented a house and paid the first month's rent, falsely representing to the owner that he and Lillian Hopkins were husband and wife. The couple moved into the house on June 20th and occupied it together until the evening of the shooting—June 21st. At about 3 o'clock in the afternoon of the day of the homicide, defendant, who had left the house that morning, returned, and though Lillian was away he attached no significance to her absence, concluding that she doubtless was at work. It was his custom to keep a pistol under the mattress of his bed. About 5 o'clock in the afternoon, while waiting for Lillian to return, defendant removed his pistol from under the mattress for the purpose of cleaning it. After oiling, cleaning, and reloading the weapon he laid it on the table in the front room, under a magazine. About 7 o'clock that evening Lillian returned to the rented premises. To an inquiry of defendant as to where she had been she replied that she had been to the beach and had had a good time. Then ensued a quarrel,

engendered, without doubt, by jealousy on the part of defendant, who in the course of the quarrel struck the woman several blows. Telling defendant that she was going to call someone to help her, Lillian left the house and went to a near-by drug-store, from which place she telephoned to Dennis Cope. Defendant, who had followed Lillian to the drug-store, picked up and carried away her purse, she having laid it on the counter while telephoning. According to defendant's testimony, he took the purse because he found in it his watch, which he claimed the woman had taken away with her without his knowledge or consent. On returning to the house after telephoning to Cope, defendant, according to Lillian Hopkins' testimony, locked the front door. Lillian succeeded in getting out of the house through a rear window. About fifteen minutes later she met Cope, and after riding around with him for a short time she returned, alone, to the house. A few minutes later, while defendant and Lillian were in the front room, Cope came to the front door and knocked for admission.

What took place from the time Cope knocked at the front door is described by Lillian Hopkins, one of the only two surviving eye-witnesses, in language which, condensed and reduced to narrative form, is substantially as follows: Mr. Hubbard was standing right inside the door. I was inside, too. After Mr. Cope rapped on the door I said: "Come on in, Dennis." Cope came in. He stood there a minute and then said, "Have you got your purse in here?" I said, "Yes, lying right near the table on a chair." Cope went to pick it up, and as he did so the defendant took it and said, "No, you can't have this purse," Cope replied, "Joe, I don't think you are treating Lillian like a lady; I don't think you are treating her right." The defendant replied, "Well, that is none of your affairs; I will take care of this. You get out of here." To which Cope, who was standing with his back to the door, replied, "No, I won't." Then they argued back and forth. They stood facing each other, about two feet apart. I was standing to the left of defendant, who kept saying—addressing his remarks to Cope—"You get out of here," while Cope kept saying, "No, I won't." Then defendant went toward Cope as though he was going to push him. I spoke up and said. "Don't do that; you will push him back down the steps—might break his neck."

While I was saying this Cope stood there without saying a word. Then defendant put his hand to Cope's chest and shoved him. Cope then took hold of defendant's right arm and shoved him back toward the table in the front room where defendant's pistol lay under a magazine. The next thing I saw was the pistol in defendant's hand. He was holding it down. Cope, at the time, was about three feet distant from defendant, who said to Cope, "Now go on and get out of here," meanwhile shaking his pistol up and down and trying to "bluff" Cope. Defendant did not appear angry. There wasn't any loud talking at any time. I stepped in between them and said, "Joe, please don't do this for my sake." He shoved me aside with his left hand and said to me, "You get away," and then he again said to Cope, "Go on and get out," to which Cope replied, "No, I won't." As defendant talked he stepped closer to Cope, who with both hands caught hold of defendant's arms between the elbows and shoulders and shoved him back; and while he had defendant by the two arms the latter, with both of his hands, caught Cope on the hips and shoved back. Then the pistol in defendant's right hand went off. Cope caught his side and said, "Oh!" and then turned around and ran down the steps. Defendant stood there without saying a word. When Cope got to the steps I said, "Why, he is shot; he will fall down there and die." Defendant ran down the steps, said, "Come on back, Cope, and we will see what we can do," and then put his arm around Cope's shoulder and helped him back up the steps. Cope, leaning against a little pillar on the porch, said, "I have to go, because I have to meet my father at 10 o'clock," and then ran down the steps, got into his machine and started off. I did not see him after that.

Defendant's account of the shooting, while differing from Lillian Hopkins' version of the unfortunate affair in some particulars, closely follows her description in all of its general aspects. After describing to the jury how he told Cope to get out and how the latter refused to go, defendant testi-fied substantially as follows: I tried to push him out of the door and he pushed back. That lasted for two or three minutes. He pushed me back against the table. Then I thought of the gun, and I picked it up and showed it to him and said, "Now will you get out?" I had no intention of

shooting him. I thought I would bluff him with the gun, but he didn't seem to take it. My finger was not on the trigger. It was outside of the trigger. The safety device was on the gun and at no time did I remove it. When I took the gun off the table we stood apart. We were separated for a few seconds. Then he advanced toward me, grabbed me by the arms and started to push me. He grabbed hold of my shoulders with both hands—between the elbows and the shoulders—and started to shove me. I shoved back. When I started to shove back I had to rest both my hands on Cope's hips. I tried to shove him out of the door and close the door in his face. When I got him pretty near to the door and was just about to shove him out, he reached out and grabbed my hand. He got hold of both my hand and the gun, I think. Then the pistol went off. I did not pull the trigger, that I know of; nor did I remove the safety device, that I know of. When he reached down and grabbed my hand and the gun he sort of twisted his body.

Cope died of his wound. The bullet entered the left side of the mid axillary line three inches above the crest of the ilium, passed upward and toward the right side at an angle of about thirty degrees and finally lodged in the soft tissues of the right armpit.

Defendant's claim that the shooting was an accident is not directly contradicted by any evidence in the case, and is at least consistent with all that was testified to by the only other living eye-witness. He was entitled, therefore, to have the theory of an accidental and unintentional shooting considered by the jury in the light of all instructions properly applicable to the case.

The trial court gave to the jury the customary definitions of the various grades of crime embraced within an information charging murder, but refused defendant's request to give the following instruction: "If you believe from the evidence that at the time of the shooting of Dennis Cope the defendant Joe Hubbard had rented the premises at No. 1016 Coronado Street in the city of Los Angeles, and was at said time occupying said premises as a tenant, then he had a right to exclude the said Dennis Cope therefrom; and if you find that the defendant ordered the said Dennis Cope to leave said premises and that the said Cope thereupon refused so to do, the said defendant Hubbard had a right to

use such reasonable force as may have been necessary to eject the said Cope from said premises; and this would be true even though you should find that the said defendant Hubbard and Lillian Hopkins were living upon said premises in an illicit relationship.''

[1] The instruction should have been given. The refusal to give it was not only error but was highly prejudicial to defendant's rights. The mere fact that the shooting was accidental would not necessarily exculpate defendant. It might have been done in the commission of an unlawful act, in which case it could be manslaughter or even murder in the second degree. Defendant could be guilty of manslaughter, notwithstanding the shooting was accidental, if the shot was fired in the commission of an unlawful act not amounting to a felony, or even though it was fired in the commission of a lawful act, if at the time defendant was using the weapon without due caution and circumspection. (Pen. Code, sec. 192, subd. 2.) He could be guilty even of murder in the second degree, notwithstanding the shooting was accidental, if it was done in the commission of a felony. As was said in *People* v. *Doyell,* 48 Cal. 94, ''Whenever one, in doing an act with the design of committing a felony, takes the life of another, even accidentally, this is murder.'' (See, also, *People* v. *Olsen,* 80 Cal. 122 [22 Pac. 125]; *Holmes* v. *State,* 88 Ala. 26 [16 Am. St. Rep. 17, 7 South. 193]; note to *People* v. *Sullivan,* 63 L. R. A. 353.) In such cases the felonious intent, as an element of the homicide, is supplied by the intention to do the unlawful act of which the homicide is a consequence. ''The intent is transferred by implication of law.'' (13 R. C. L., p. 844.) Or, as is said in *People* v. *Olsen, supra* (80 Cal. 126 [22 Pac. 126]), ''where the killing is the result of the commission or the attempt to commit a felony, whether it be one of those named in section 189 of the code or not, the law attaches the felonious intent accompanying the crime contemplated to the act of killing, and constitutes it murder.'' Defendant could be guilty of murder in the second degree, even though he was not engaged in the commission of a felony and notwithstanding the shooting were unintentioal, if the circumstances disclose such a wanton recklessness as to show an abandoned and malignant heart. (Pen. Code, sec. 188; *People* v. *Doyell,* 48 Cal. 96.) Or he could be guilty of murder in

the second degree, even though the killing was unintentional, if it happened in the commission of any unlawful act not amounting to a felony but which in its consequences naturally tended to destroy life. (*People* v. *Doyell,* 48 Cal. 95.) That the learned trial judge was mindful of these principles is shown by the fact that he very properly charged the jury that if the killing is "done in the commission of an unlawful act the natural consequences of which are dangerous to life, or is committed in the attempt to perpetrate a felony other than those mentioned in the description of murder in the first degree, or the circumstances of the killing show an abandoned heart, this is murder of the second degree."

It thus will be seen that it was of the utmost importance to defendant's case that the jury should be fully advised as to his right to eject Cope from the premises. For whether the killing, assuming it to have been accidental and unintentional, was done in an attempt to perpetrate a felony, or was done in the commission of an unlawful act not amounting to a felony but which in its consequences naturally tended to destroy life, or whether the circumstances showed an abandoned heart, are all questions to which a jury of laymen could not be expected to give correct answers unless they were given some instruction respecting defendant's legal right to eject Cope from the premises and also as to what force might rightfully be used for that purpose. It is quite possible that the jurors, because they were not instructed as to his right to eject Cope from the premises and to use all force reasonably necessary to that end, believed that defendant was guilty of a felony in endeavoring to remove Cope by force; and is quite possible that the verdict of murder in the second degree was returned because, and solely because, the jury believed that the shot which killed Cope, even if it were fired accidentally and unintentionally, was fired while defendant was committing or attempting to commit a felony. These considerations will show how essential it was that the jury should be fully instructed with respect to defendant's right to eject Cope and to use force if necessary.

It only remains to consider, therefore, whether the proposed instruction correctly states the law. If it does, then, for the

reasons stated, its refusal was clearly prejudicial to defendant's rights.

[2] That the requested instruction is a correct statement of the law is clear. Defendant was the sole tenant of the premises. Though he had rented the house for the occupancy of himself and his paramour, he, and he only, was the legal tenant; and when Cope, uninvited by defendant, crossed the threshold, defendant, who was rightly in possession of his rented premises, had the right, notwithstanding Lillian Hopkins' invitation to Cope to enter, to request the intruder to leave, and upon the latter's refusal to go to use such force as might be reasonably necessary to remove him, after allowing a reasonable time for his departure. "One who is lawfully in charge of premises, and has requested another to leave whom he had a right so to request, may lawfully use as much force as is necessary to remove such other, after allowing him a reasonable time to depart." (5 C. J., p. 745.) It has been held that the fact that the dwelling-house occupied by a family is the property of the wife does not affect the right of the husband, as the "head" of the family, to use such force as may be necessary to eject a guest who fails to leave the house when ordered to do so by the husband. (*State* v. *Lockwood*, 17 Del. (1 Penne.) 76 [39 Atl. 589].) [3] The person who is acting in defense of his habitation must first use moderate means before resorting to extreme measures. But he may resist force with force, increasing it in the ratio of the intruder's resistance, without measuring it in golden scales; and whether he has used excessive force or not is a question for the jury. "The question of the amount of force justified in repelling an assault *or maintaining the possession of property* (italics ours) is one peculiarly within the province of the jury." (*Fawkes* v. *Reynolds*, 190 Cal. 204 [211 Pac. 449].)

While one may use force, if necessary to remove an intruder who refuses to leave after being requested to depart, it must not be assumed that he may *intentionally* kill another solely in defense of habitation. No person may intentionally kill merely because he cannot otherwise effect his object, although the object sought to be effected is right. He can kill intentionally only in defense of life or person, or to prevent a felony. (Pen. Code, sec. 197.) · [4] But a person assailed in his own house is not bound to retreat from

the house to avoid violence, even though a retreat may safely be made. And if the intruder resists his ejection and assaults the lawful occupant, the latter need not retreat, but, in protecting his person, he may, if necessary, intentionally take the intruder's life if he has reason to believe and does believe that his own life is in danger or that he is in danger of receiving great bodily harm. (*People* v. *Lewis,* 117 Cal. 186 [59 Am. St. Rep. 167, 48 Pac. 1088].) In *Morgan* v. *Durfee,* 69 Mo. 469 [33 Am. Rep. 508], it is said that "this right of defending one's dwelling is in some sense superior to that of the defense of his person; for in the latter case it is frequently the duty of the assaulted to flee, if the fierceness of the assault will permit, while in the former a man assaulted in his dwelling is not obliged to retreat, but may stand his ground, defend his possession and use such means as are absolutely necessary to repel the assailant from his house, even to the taking of life." In *McIlvoy* v. *Cockran,* 9 Ky. (2 A. K. Marsh.) 276, the court employed this language: "But although a wounding cannot be justified barely in defense of possession, yet if in attempting to remove the intruder, or prevent his forcible entry, he should commit an assault upon the person of the possessor or his family, and the owner should, in defense of himself or family, wound him, the wounding may no doubt be justified."

There is authority for the proposition that one who has ordered an intruder to leave his habitation has the right to draw a weapon and to hold it in readiness as he goes toward the intruder and orders him to depart. Thus in *State* v. *Raper,* 141 Mo. 327 [42 S. W. 935], the court, referring to the rights of the prosecuting witness, one James Long, employed this language: "It was his house, and he had the right to protect it against any peace disturbing, profane intruder, even, if necessary, to the taking of life. [Citing authorities.] For this reason Long had the right to draw and open his knife, and hold it in his hand ready for use. when he went towards defendant and ordered him out of his house." In *State* v. *Yancey,* 74 N. C. 244, the court says that "*a threat to use a deadly weapon,* with the power to do it, may often be justifiable when a *battery* with the same would not be." (See, also, *State* v. *Austin,* 123 N. C. 749 [31 S. E. 731].)

The pistol was discharged while defendant's hands rested upon Cope's hips during the struggle. At no time prior to the moment when he caught Cope by the hips did defendant point the weapon at the intruder. Lillian Hopkins, called as a witness for the people, testified that defendant did not point the pistol directly at Cope, but that even when he used it to "bluff" Cope he held it pointed downward. That is, it was pointed toward the ground when defendant shook it up and down and said to Cope, "Now go on and get out." [5] Assuming, therefore, without conceding, that it was unlawful thus to "bluff" Cope by shaking the pistol in his presence in the manner described, still defendant's act would amount to no more than a misdemeanor under section 417 of the Penal Code, and would not amount to a felony. (*People v. Ross,* 19 Cal. App. 469 [126 Pac. 375].) But if defendant's conduct, prior to the actual discharge of the pistol, was at most but a misdemeanor, and if, as he testified, the shot was fired accidentally and unintentionally, he could not properly be found guilty of murder on the theory that the shooting, though accidental, was done in the commission of or attempt to commit a felony. How essential it was therefore, that the jury should be fully instructed as to defendant's right to remove Cope from the house and to use force if necessary to effect that purpose!

Our conclusion is that defendant was entitled to have the jury instructed as requested. And as we cannot say that the verdict which was returned in this case would have been the one which the jury would have brought in had the requested instruction been given, it must be held that the error in refusing to give the instruction resulted in a "miscarriage of justice," necessitating a reversal of the judgment.

[6] Since there must be a retrial it is necessary to consider one other matter. Complaint is made of an instruction in the course of which the court charged the jury that if the killing "is done in the commission of an unlawful act, *the natural consequences of which are dangerous to life, . . .* this is murder of the second degree." The instruction as a whole, including the part which we have quoted, follows almost literally the language of the supreme court in *People v. Doyell,* 48 Cal. 94, and is unquestionably a correct statement of the law. If the natural consequences of the unlawful act be dangerous to human life, then the unintentional

killing will be murder, even though the unlawful act amount to no more than a misdemeanor. For if the natural consequences of an unlawful act be dangerous to life, and so known to the wrongdoer, there is implied such a high degree of conscious and willful recklessness as to amount to that malignancy of heart which constitutes malice, and the malice aforethought which is an essential element of the crime of murder will be implied. This is clearly stated in the Doyell case, where it is said: "But, besides those committed in the perpetration of felonies, a large number of homicides have been adjudged murder where the specific intent to take life does not appear or does not exist. Thus, where the killing is involuntary, but happens in the commission of an unlawful act which, in its consequence, naturally tends to destroy life, it is murder; so, if the intent to kill is not made apparent, but the killing is unlawful and not done in the heat of passion; or, the specific intent to take life not appearing, all the circumstances show an abandoned and malignant heart. In these, and in like cases, the malice aforethought is implied, the law attributing to the slayer the intent to kill, although such intent is not made manifest as a fact." (*People* v. *Doyell,* 48 Cal. 95.) An instruction similar to that of which appellant complains was upheld in *Josey* v. *State,* 137 Ga. 769 [74 S. E. 282]. (See, also, *Tarvers* v. *State,* 90 Tenn. 485 [16 S. W. 1041], and *People* v. *Holmes,* 118 Cal. 460 [50 Pac. 675].)

The judgment and the order denying a new trial are reversed.

Works, J., and Craig, J., concurred.