[Crim. No. 11872. Second Dist., Div. Two. Mar. 13, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. PAUL DAVID SMITH, Defendant and Appellant.

Hanifin & Hanifin and Cletus J. Hanifin for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Walter R. Jones, Deputy Attorney General, for Plaintiff and Respondent.

ROTH, P. J.—Appellant was charged with first degree murder, tried by a jury and convicted of voluntary manslaughter. He was sentenced to state prison with the recommendation that the Adult Authority consider a minimum sentence.

The victim, one Frank Leslie, was shot in the presence of Lemuel Haley and Carol Hennessey, both of whom, among others, were witnesses for the prosecution. Appellant, in addition to others, testified in his own behalf.

No point would be served in setting forth testimony severally of the eyewitnesses, or of the others, since no question is raised as to the sufficiency of the evidence to sustain the jury's verdict and the judgment entered thereon.

Appellant complains that the trial court refused to give an instruction of the extent of his rights to eject a trespasser, violated the *Dorado* rule, and refused to admit testimony hereinafter pointed out. Appellant complains these errors were prejudicial and require reversal pursuant to the provisions of article VI, section 4½, of our Constitution.*

The testimony of appellant gives only his version of the crime. We review it preliminarily because it provides the theory of his defense and because the errors complained of must be analyzed with his theory in mind.

---

*Reporter's Note: Now art. VI, § 13. See constitutional revision adopted November 8, 1966.

On April 5, 1965, appellant left his home on Garvey Avenue at approximately 6 a.m. Lemuel Haley, who apparently lived with him, was in his home at the time he left. Later that morning appellant, having met Frank Leslie, the victim, and Carol Hennessey with whom Leslie was apparently living at the time, returned to the Garvey Avenue address with Leslie and Hennessey. Thereafter, appellant stated he desired to serve a notice on someone in the neighborhood and Leslie said he would go along. Leslie made it known to appellant he expected to go to jail the next day and wanted to leave his things with appellant. Appellant thereupon picked up the belongings of Leslie and Hennessey, loaded the same into a pickup truck appellant was driving, and returned to the Garvey Avenue address.

Leslie and Hennessey left appellant's home at approximately 11 a.m., returning later. Appellant apparently spent the day at the Garvey Avenue address, drinking wine, sleeping or eating.

Between 6:30 and 7 p.m. of that day, appellant was awakened by Haley. Leslie and Mrs. Hennessey were sitting at a table in the kitchen drinking wine. Appellant arose from his bed, Haley thereupon occupied it. The bed was in the kitchen.

Hennessey went into the front room to use the telephone. Leslie drew appellant aside and asked to borrow some money, telling appellant he needed $100 for attorney's fees on a probation matter which had been set for the next day. Appellant said he had the money, but could not remember where it was hidden.

"He told me I might just as well remember where it was and get it because he knew I had it and was going to get it one way or another before I was dead or afterwards.

" . . . . . . . . . . . . .

"Well, I told him that he couldn't act that way in my house, and so forth, and was trying to—I had edged over, and I would—I ran over and threw the front door open, which opens out, incidentally, and asked him to leave, and I was trying to get out of the door, hoping that the man that usually worked next door was still there, you see, but—

" . . . . . . . . . . . . .

"I started out at the door, but in the process of slowing up to open the door to throw it outward, why, he grabbed me by the pants and the belt from the back with his right hand, apparently.

" . . . . . . . . . . . . .

"Well, I mean it was one hand or the other, and he swung me back into the room, and he hit me right up beside of the head, right at the butt of the ear."

Leslie struck appellant several times and knocked him into the kitchen. During the melee appellant kicked Leslie, propelling him into the front room, whereupon appellant slammed the kitchen door, closed it, and shoved a chisel under it. Within three or four seconds, Leslie forced the kitchen door open, crowded appellant toward the bed, punching him in the ribs with both hands. Appellant fell on Haley, who was lying on the bed and Haley scrambled off the bed and ran toward the back door. Leslie proceeded to beat appellant and appellant again succeeded in kicking Leslie, projecting him into the front room.

Appellant grabbed a gun from under the mattress and rushed to the kitchen door, which he tried to close, concurrently firing a shot into the ceiling to scare Leslie away. Undaunted, Leslie returned to the door and appeared to have something that looked like a piece of pipe or a gun in his hand. Leslie reached around the kitchen doorway with his left hand as appellant's gun went off. At the time the shot was fired, all of appellant's body was in the kitchen.

Appellant then reached into a closet in the kitchen, pulled out a bottle of whiskey and took a drink. He admitted he was intoxicated at the time officers arrived.

It appears to be uncontroverted that immediately following the shooting, Hennessey told appellant she was going to call the police, and he said "go ahead." She called the police at approximately 7:22 p.m., told the police that there was a disturbance, gave the address and handed the phone to appellant.

Appellant asked: "Is this the cops?" The police dispatcher identified himself as the Baldwin Park Police Department and asked for the identity of the caller. Appellant replied: "Hell, everybody knows me. I'm Paul Smith." The dispatcher asked what had occurred. Appellant answered that he just shot Frank Leslie. The officer then asked what type of gun was used. Appellant replied a thirty-ought-six. Within ten minutes thereafter, officers entered appellant's house. The deceased was lying on the floor of the front room. Appellant was standing with his back against the front room table with a rifle in his hand. Haley was standing next to appellant. Hennessey was leaning over the deceased, wiping blood from his chest and arms. On order of the officers the rifle was

surrendered. The officers noted that appellant had bruises and a wound over his right eye.

One of the officers said: ''What happened here?'' Appellant replied: ''There's been a murder here or something, you asshole.'' Appellant, Haley and Hennessey were then advised of their constitutional rights and all three were placed under arrest. All three appeared to be drunk.

One of the officers examined the rifle and found an expended cartridge in the chamber. Another expended cartridge was observed on the floor. The three were then transported to the police station.

The day after the shooting, appellant was examined by a doctor and the report showed that appellant had large bruises on the left thigh, right thigh, left chest, right side and abrasions of the eye and face.

There is no dispute that Hennessey and Leslie were guests. The testimony of Hennessey and Haley as to how the fatal altercation commenced differs. Hennessey recollected nothing about the conversation in respect of $100 or the order appellant gave deceased to leave. She testified in effect that she and Leslie were on the sofa talking. The next thing she knew Leslie was shot and had fallen on the floor. She did not hear appellant speak to Leslie before he fell to the floor.

Haley testified that he heard Hennessey dial the front room telephone. Appellant told her to ''get off the phone.'' He touched her. Hennessey laughingly said ''let me alone.'' Leslie ordered appellant to let her alone. Appellant retorted he didn't want Hennessey using the phone. Strong words were exchanged. Appellant told Leslie to go to hell and ordered him to leave the house. Leslie replied that he didn't have to leave, he had a right to stay. The actual fight is then described in substance by Haley as it was testified to by appellant.

Appellant was permitted to testify, and he did, that prior to the fatal shooting he had knowledge that: ''Well pretty near every time . . . I seen him he was in a fight with someone.'' Leslie had repeatedly beaten his wife, Dorothea Leslie, and that every time he saw Dorothea, she either had a broken nose or a black eye; Leslie had been a prize-fighter or an ex-prize-fighter; he saw one Kenny Wright with a bruise on his back after Leslie had kicked him and had seen one Art Stein with a swollen and bruised jaw after he had been hit by Leslie; he'd heard that the deceased had broken both of the

jaws of one Mr. Oliver, had beaten up on a Mr. Cooper, and had mistreated and broken the arm of one Katie G.

Further, that he heard that Leslie had beaten up on one Eddie Baker, an old man, 72 years old, had broken Baker's teeth, so that he could not properly eat; he knew an old man named Joe, and that the victim had broken two or three of his ribs, and that Leslie had once offered to shake hands with one Frank Stock, and then knocked him down.

In addition, appellant testified that approximately three weeks before the shooting, the victim had been at the house of one Eddie Roper, who was lying on a couch, when Leslie came in and began beating appellant and kicking Roper. It was in evidence too that the keys to appellant's car and home, which had been in appellant's truck, disappeared and that on April 5 appellant, seeing the keys in Leslie's possession, asked for the return of the keys, but Leslie refused to return them.

Appellant further testified that two weeks prior to April 5, 1965, at a place known as ''The Old Timer,'' Leslie hit appellant, and that on March 31, 1965, just five days before the shooting, Leslie beat appellant until he was unconscious, that there was much blood on the floor, and that on the same night, the victim beat Haley, his roommate, and that Haley called the police after this beating, seeking protection.

Finally, appellant testified that he didn't intend to shoot the gun at the victim; the shooting was an accident; it was necessary to use deadly force to ward off his attacker; he believed that he was in imminent danger of great bodily harm; he didn't know whether the object in the victim's hand at the time the gun went off, was a pipe or a gun, and that he was very excited.

▮▮▮▮ Appellant contends error was committed because the trial court refused to instruct the jury on whether Leslie had become a trespasser and the legal consequences thereof. However, the record does not disclose any request for such an instruction, nor any refusal to give one. Investigation discloses that such instruction, the exact nature of which is not before us, was orally discussed in the trial judge's chambers. It is clear from the facts that the jury could have concluded that appellant ordered Leslie to leave his home and they could have properly found Leslie was a trespasser. However, it is also clear from the facts that appellant's primary theory was self-defense. Instructions on this defense also advised the jury of defendant's right to defend his property. These instruc-

tions were complete and adequate and fully embraced the factual situation before us.

■ The defense of protection of property is therefore redundant in the light of the defense of self-defense.

In a well considered article, Vol. 13, No. 3, Stanford Law Review (May 1961) at page 575, it is said: "The common-law defense of property protection in homicide cases thus seems redundant in light of the defense of self-defense, and in its strictest sense there was no independent right at common law to use deadly force in defense of property."

■ Instructions were requested and given on voluntary manslaughter, as well as on first and second degree murder, and on justifiable homicide in defense of person. The record also shows this instruction was given in the words of Penal Code, section 197, subdivision 2, and the word "property" is clearly mentioned in the instruction. There is no complaint of error of commission or omission in respect of the instruction actually given.

Assuming that if the record showed a request for a proper instruction on trespass, appellant argues that a failure to give it was reversible error and cites *People* v. *Hubbard,* 64 Cal. App. 27 [220 P. 315], and *People* v. *Reese,* 65 Cal.App.2d 329 [150 P.2d 571].

In both the *Hubbard* and *Reese* cases, a gun was used by the respective defendants to enforce their demands on the trespasser to leave the premises. The violence ultimately occurred when the trespasser persisted. In the present case, violence to appellant's person occurred prior to appellant obtaining the weapon. As such, it is the contention of respondent that the weapon was, in reality, used in conjunction with the abuse suffered by appellant to his person and not as a tool to defend appellant's property against trespass. Hence, instructions on the right of self-defense were in conformance with the facts.

Moreover, the rationale for the decisions of both *Hubbard* and *Reese* was based on the possibility that the jury in arriving at the second degree verdict erroneously viewed the use by force by the defendants to be felonious. The manslaughter verdict in the case at bar precludes any such felony-murder implication.

Aggression against the property of another clearly and necessarily includes the offense of trespass, but it is equally clear that a person has no greater rights in defense of his property than he does of his life. There was no prejudicial

error in the court's failure to give an instruction which was not formally and specifically requested, especially when the context of what might have been a properly requested instruction was adequately covered in others that were given.

 Appellant contends too that the court erred in refusing to allow evidence of Leslie's reputation for *honesty,* and in excluding evidence of certain acts of violent thievery committed by the deceased, offered in proof of such reputation.

The court sustained an objection to character evidence on the subject of the honesty. During the cross-examination of Hennessey, defense counsel on the subject of Leslie's reputation for honesty, offered to prove ". . . on the 31st day of March, 1965, this witness Carol Hennessey, together with Don Campbell and Frank Leslie, came to the home of Mr. Smith at 14131 East Garvey Boulevard in Baldwin Park. It was about 7:00 o'clock in the evening. At that time Mr. Smith was seated at the table, as was Mr. Jay Haley. At that particular time Don Campbell struck Mr. Jay Haley and knocked him off the chair, and at the same time Mr. Frank Leslie struck Mr. Smith and knocked him unconscious; and that thereafter Mrs. Hennessey saw Campbell reach in Haley's pocket and take money in the approximate amount of $90 out of Haley's pocket; and at the time that this preliminary hearing was first had, or rather first set for hearing, in West Covina, Citrus Court, that Don Campbell was present in the hallway, as was this particular witness, Mrs. Hennessey, and that at that time Mr. Haley talked with Mrs. Hennessey, and Mr. Haley said to Mrs. Hennessey, 'Campbell has a lot of guts to be here in court when I'm here, hasn't he?' And she said yes, and that Haley told about losing his money, and she said, 'I saw him take the money out of your pocket,' and then Haley said, 'It was $90,' and Mrs. Hennessey said, 'No, Campbell only split $30 with us.' "

Defense counsel further offered on the subject of honesty "to prove that Frank Leslie and Don Campbell were in the Old Timer one month earlier, before March 1965, and at that time Haley showed them he had about $100, and when he walked out of there at 2:00 o'clock in the morning, he saw them, both these men there, just before walking out; and that he was hit over the head and he lost his $100, and when he woke up he had no money."

Defense counsel further offered on the subject of honesty to "prove that, first, on the 10th of February the husband was in

the house with Carol Hennessey and Frank Leslie and two or three others, including a fellow named Don Campbell. Then Leslie and Campbell both ordered the woman's husband Eugene Silver to lay face down on the floor. Afterwards they removed clothing and many articles of appliances, TV, radio, and recorder, and other items; . . ."

Appellant's testimony outlined in the beginning, shows that the trial court did permit appellant to testify to Leslie's well known reputation for violence and also did permit appellant to recite a series of specific acts of violence to show appellant's state of mind at the time of the fatal quarrel. Such evidence was admitted to show apprehension of danger known to appellant. ▮▮ The law recognizes the well established fact in human experience that the known reputation of an assailant as to violence, even if specific acts are not within the knowledge of a person assaulted, has a material bearing on the degree and nature of apprehension of danger on the part of the person assaulted (and further even if the reputation is unknown) to show that one who is turbulent and violent may more readily provoke or assume the aggressive in an encounter. (Witkin, Cal. Evidence (1958) p. 154; *People* v. *Edwards,* 41 Cal. 640, 644; *People* v. *Lamar,* 148 Cal. 564, 574 [83 P. 993]; *People* v. *Swigart,* 80 Cal.App. 31, 44-45 [251 P. 343].)

▮▮ Leslie's reputation for honesty would ordinarily not be pertinent. However, the offers of proof outlined contain a recital of specific aggressive and violent acts which were unlawful and dishonest and which were known to appellant.

The admission of these specific aggressive acts were similar to those which had already been testified to by appellant. ▮▮ Although there may have been in the past some controversy as to the admission of specific acts of aggression rather than proof of a reputation for aggression and violence, this controversy appears to have been settled by the new Evidence Code.

Speaking of specific acts, as relevant, Witkin, in California Evidence (2d ed., 1966) says at page 295:

"This is the most controversial change. California cases sanctioned the admission of evidence of previous threats or attacks on the defendant himself, to show his reasonable apprehension of danger. (See *People* v. *Yokum, supra,* 145 C.A.2d 245, 260 [302 P.2d 406]; cf. *People* v. *Soules* (1940) 41 C.A.2d 298, 305 [106 P.2d 639]; 25 Cal.L.Rev. 469.) Evi-

dence of attacks on others was generally excluded. (See *People* v. *Soules, supra,* 41 C.A.2d 306; *People* v. *Keys* (1944) 62 C.A.2d 903, 912 [145 P.2d 589]; *People* v. *Wong* (1947) 83 C.A.2d 60, 69 [187 P.2d 828]; *People* v. *Kennedy* (1962) 200 C.A.2d 814, 818 [19 C.R. 683]; *Villines* v. *Tomerlin* (1962) 206 C.A.2d 448, 452 [23 C.R. 671]; 25 Cal.L.Rev. 468; 121 A.L.R. 380.)

"But a distinction was made where the defendant claimed to have been in fear of the deceased victim of a homicide: The defendant's mental state was relevant on the issue of self-defense, and he could show the reasonableness of his fear by evidence of prior violent acts committed by the deceased against other persons. (See *People* v. *Davis, supra,* 63 C.2d 648, 656 [47 Cal.Rptr. 801, 408 P.2d 129], following *People* v. *Carmichael* (1926) 198 C. 534, 548 [246 P. 62]; *People* v. *Mathis* (1965) 63 C.2d 416, 430 [46 C.R. 785, 406 P.2d 65].) Thus, in the *Davis* case, defendant testified that he saw the deceased commit several acts of violence, beating and cutting his victims with a knife; that the deceased had told him of committing violent crimes; and that he had heard of other acts of violence of the deceased. He also called three of the victims as witnesses, but none was allowed to testify to the attacks by the deceased. *Held,* it was error (though not prejudicial here) to exclude this evidence.

"Under Ev.C. 1103 this distinction is obsolete: The defendant may offer specific acts of the victim and the prosecution may rebut with similar evidence."

However, the offers were cumulative evidence. It had already been established by an abundance of evidence that Leslie was a violent and pugnacious individual. In our opinion, failure to receive the evidence offered did not constitute prejudicial error. (Pen. Code, § 1404; *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243]; *People* v. *Cockrell,* 63 Cal.2d 659, 671 [47 Cal.Rptr. 788, 408 P.2d 116].)

Appellant contends that he should have been permitted to impeach Mrs. Hennessey on the basis of contradictory statements made concerning a theft from Haley by one Campbell five days prior to the killing here involved. Appellant offered to show that contrary to her statements at trial, Mrs. Hennessey had both observed the theft and shared in its proceeds.

Section 2051 of the Code of Civil Procedure allows impeachment of a witness "by contradictory evidence or by evidence that his general reputation for truth, honesty, or

integrity is bad, *but not by evidence of particular wrongful acts,*" (italics added) except conviction of a felony. Evidence of Mrs. Hennessey's having shared in the proceeds of the theft is clearly evidence of a specific act of misconduct and not admissible for impeachment. (*People* v. *Geibel,* 93 Cal. App.2d 147, 173 [208 P.2d 743]; *People* v. *Whalen,* 70 Cal. App.2d 142, 149 [160 P.2d 560].)

As to impeachment of Mrs. Hennessey on the contradictory and inconsistent statements regarding observation of the theft (as allowed by Code Civ. Proc., § 2052), it is consistently held that the matter on which impeachment may be based must have bearing on a material issue in the case. (*People* v. *McCarthy,* 88 Cal.App.2d 883, 889 [200 P.2d 69].) ▆ Whether the inconsistent statement is material is "primarily determined by whether the matter would be admissible independently of impeachment." (*Travis* v. *Southern Pacific Co.,* 210 Cal.App.2d 410, 420 [26 Cal.Rptr. 700].) ▆ Whether Campbell robbed Haley, and whether Mrs. Hennessey observed this, are clearly immaterial to the issue of whether appellant shot Leslie. The court properly rejected appellant's offer of proof for impeachment purposes.

▆ Appellant's contention that his statement on the telephone that he shot Frank Leslie was erroneously admitted as having been made prior to a warning of his rights to silence and counsel (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]) is without merit. Appellant was not in "custody" of police at the time of his statements; nor could it be said that the officer's questions had changed the nature of the proceedings from "investigatory" to "accusatory." In *People* v. *Cotter,* 63 Cal.2d 386, at p. 393 [46 Cal.Rptr. 622, 405 P.2d 862], the Supreme Court held a telephonic confession in circumstances similar to the instant case, "clearly admissible as having been made during the investigatory stage as defined in *Dorado,* and in *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]." See also *People* v. *Beverly,* 233 Cal.App.2d 702, 714-715 [43 Cal.Rptr. 743].

The judgment is affirmed.

Herndon, J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 10, 1967.