[Crim. No. 2745.   Second Appellate District, Division One.—September 16, 1935.]

THE PEOPLE, Respondent, v. HERBERT LESLIE, Appellant.

Harry Margid for Appellant.

U. S. Webb, Attorney-General, and Eugene M. Elson, Deputy Attorney-General, for Respondent.

ROTH, J., *pro tem.*—Defendant was charged with assault by means of force likely to produce great bodily injury upon Emily Morris Zurndorfer, and was found guilty of simple assault by a jury and was sentenced to six months in the

county jail. From the judgment and order denying his motion for a new trial, defendant appeals.

The charge arose from the following facts: Between 1 and 2 o'clock in the morning of February 17, 1935, two women named Ardell and Zurndorfer (the latter the complaining witness herein), neighbors of defendant, called on defendant and his wife on their return home from a party which they had attended. The evidence is conflicting as to whether or not the women in question were under the influence of intoxicating liquor at the time. Referring to the complaining witness Zurndorfer at the time of pronouncing the sentence, the trial court said: "I think unquestionably that on that occasion she was to some extent under the influence of liquor; . . . " At the time of the entry of the two women, the defendant Leslie, his wife, his step-daughter and one Hamilton were playing "hearts". There was an exchange of some pleasantries, and there is a substantial amount of conflicting evidence as to whether or not both women accepted drinks poured by defendant's wife, although it is plain that the complaining witness accepted one such drink which she referred to "as the stuff which was poured". This stuff was gin. During the course of the game, the visitors discussed the party they had attended. According to the complaining witness, defendant Leslie was in an ugly mood and turned to Mrs. Ardell and said: "That bastard of a husband of yours ritzed me on the street, the other day; I hate his guts, and that goes for you, too. . . . He said, 'Now, you dirty, lousy, drunken bums, get out of my house!' And I resented it. I said, 'You ought to be ashamed to talk that way to ladies.' And he said, 'Oh, yeah?' and with that—and with that he raised his right fist; Mrs. Ardell was near her coat; she was evidently going to grab her coat. . . . I was across the room, over toward the door where our coats were lying; and, when I said to him 'You ought to be ashamed to talk that way to ladies,' he struck her in the jaw with his right fist, on the left side of her jaw, and she wore a mark there for two weeks. . . . When he hit her, I screamed so loud he was startled by it; and he said, 'I will knock the so-and-so out of you.' Q. And what did you say? A. I did not say anything. There was a bottle there, and I said, 'If you come near me, I will let you have

it.' Q. How big a bottle was it? A. Well, it was about a quart size.''

Hamilton, according to this witness, then forced defendant back into the kitchen and the ladies prepared to leave, but as the women were leaving, Hamilton was making apologies for defendant's conduct, when, according to the complaining witness, '' . . . And with that Leslie leaped from the kitchen; it was a swinging door; leaped from the door, and, with his right fist—I was facing Mr. Hamilton—he struck me on the right side of my jaw.''

According to Hamilton, who undoubtedly was, and, so far as the record shows, may be considered the least interested of all the witnesses, the altercation commenced and took place as follows:

'' . . . and Mrs. Morris (another name for Mrs. Zurndorfer) said, 'Come on back here; do not pay any attention to him; he is nothing around here; come on back.' So Mrs. Ardell came back; and she sat down in the chair that had been vacated by Mrs. Leslie. And Mr. Leslie got up and walked around, and he took her by the arm. He said, 'Come on; you get out of here; and I do not want you to come back any more.' And Mrs. Ardell broke away from him and ran across the room; and Mr. Leslie went over by the couch; he kept telling them to go out and stay out. Then Mrs. Morris (the complaining witness) ran across the room from where she was standing and hit—well, she attacked Mr. Leslie and knocked him over on the couch. Q. What do you mean by 'she attacked him'? A. She pushed him and knocked him over on the couch and started to pummel him and kick him, and screaming and all that; and Mrs. Ardell was standing over in the corner, screaming just as loudly as she could. . . . and so I got up then; and I went over and I separated them; and I told him, Mr. Leslie, to go on out in the other room. In the meantime, Mrs. Morris ran across the room and grabbed the bottle. She said she was going to come over there and crack his skull and a few things like that. And Mrs. Ardell left. Well, I was afraid something pretty drastic would happen; so I went over and pushed her up against the wall and tried to take the bottle from her; but I was sideways to her, and I could not quite reach it. Q. Where was Mr. Leslie at the time? A. Mr. Leslie was still standing; he

had gotten up from the couch, and was standing at the end of it. And I persuaded him to go into the kitchen. . . . he went into the kitchen. Then I finally did get the bottle away from Mrs. Morris; and, in the meantime, Mrs. Ardell had come back in the room. So I persuaded them both to go; and, as they left, why, they both told me they were glad to meet me, but they had not had such a swell time; and Mrs. Ardell said she was going to get even with him; she was going to tell her husband, or something . . . as I was doing that, why, I heard some glass cracking, and I looked around, and a part of the doorway had gone in, and a couple of windows. Just then Mr. Leslie came out of the kitchen; and he went there to the door, and, just about the time he got to the door, he was met by Mrs. Morris; and she came in; and she had one hand behind her, or something, and he grabbed her by the arm; he turned her around to push her out. She said she was going to come in there and get him, this time. I did not pay much attention to it. It all happened in a flash. So, by the time I got over to the door, some one had separated them; I could not see much; it was pretty dark out there in the court. Q. Did you see them fall out of the door? A. Yes, they sort of tripped on the sill, or something like that; I could not see what it was. I was in the middle of the room. Q. Who fell out first? A. Mrs. Morris. . . . Q. From the time they both fell out of the door there, until the time you got out there, how much time elapsed, approximately? A. Oh, I don't know; about—it could not have been much more than about a minute at the most.''

That the complaining witness had a bottle in her hand at the time the blow is alleged to have been struck is further corroborated by her own testimony as follows:

''I screamed loud when he hit her. . . . I thought if he hit my friend for no reason, he would hit me; and I grabbed a bottle, and I said, 'If you come near me, I will let you have it.' . . . With that, his friend, Mr. Hamilton, got between us and pushed him into the kitchen.''

■ There is much more to the complaining witness' version of the affray. The testimony was such that the jury could reasonably conclude that the defendant was drunk, vicious, profane and aggressive. The recital of all evidence

in detail would be of little avail, except to show that the jury had an abundance of evidence upon which to find defendant guilty of simple assault as it did. The defense version of the affray, however, as it may be pictured from the brief excerpts of testimony given by Hamilton, is amply supported by the testimony of other defense witnesses. If the defense evidence be accepted as the fact, then, so far as the complaining witness was concerned, defendant may have been acting in self-defense, and was entitled to have the jury instructed on that phase of the law. Instructions on the law of self-defense were submitted and requested by the defendant. They were refused by the court. In addition, during the argument to the jury, defense counsel commenced to argue the question of self-defense, when he was interrupted, the trial court saying: "Just a moment. There is no element of self defense or protection of home involved here, and I will ask you not to discuss that feature of the law."

We are unable to say that the result of this case would have been the same had the defendant been allowed to argue the question of self-defense and had the jury been instructed on that phase of the law. Consequently, we feel that the court committed prejudicial error in making the remark quoted, and in omitting to instruct the jury on the law of self-defense.

The court in its remarks at the time of sentence referred to the complaining witness as "a comparatively small, frail woman". But we do not understand that the impulse to defend one's self is exclusively dictated by size or sex. An invalid with a loaded automatic in hand can be more dangerous and cause much more terror than an unarmed, heavily muscled wrestler, and a small, frail woman in an intoxicated condition with a quart sized bottle poised in her hand might call for the application of more heroic treatment than a weaponless male of defendant's size and weight. If the jury believed defendant's evidence, there can be no question but that such evidence would support the inference that defendant had reasonable ground for believing that the complaining witness intended to do him bodily harm and that there was imminent danger that she could do so. Facts and circumstances of such nature make out a good plea of self-defense. (*People* v. *Guidice*, 73 Cal. 226 [15 Pac. 44] ; *People* v. *Iams*,

57 Cal. 115; *People* v. *Hubbard,* 64 Cal. App. 27 [220 Pac. 315].)

The judgment of conviction and the order denying defendant's motion for new trial are reversed.

Houser, Acting P. J., and York, J., concurred.