Filed 7/17/15  P. v. Kennedy CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES WESLEY KENNEDY,<br><br>    Defendant and Appellant. | F067222<br><br>(Super. Ct. No. CRF39839)<br><br>**OPINION** |

## THE COURT*

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

James Wesley Kennedy, in pro. per., for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Before Levy, Acting P.J., Detjen, J. and Peña, J.

## INTRODUCTION

Defendant James Wesley Kennedy was convicted of assault with a firearm, discharge of a firearm with gross negligence, exhibiting a firearm, and battery. On appeal, he asserts error by claiming he used reasonable force to stand his ground and defend himself. We will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*The People's case*

On November 4, 2012, defendant's grandson Sean and granddaughter Carolyn were in the company of Frank Harp's son Zachary and daughter Hannah. The girls became friends playing volleyball at the local high school. Harp believed Carolyn had a crush on his son Zach. When defendant arrived at Harp's property in Coulterville, Harp was exiting the driveway to pick up the kids at a nearby market. Defendant was irritated and asked Harp where the kids were. Defendant's demeanor changed, however, and he began yelling and cussing; he grabbed the steering wheel in his vehicle and shook it.

Harp asked defendant not to yell at him. Defendant responded by getting out of his vehicle and challenging Harp to a fight, stating, "'Get out. I'm not afraid of you. Get out. You creep.'" Harp refused to get out of his vehicle, believing it ridiculous to fight. Harp told defendant to get back into his vehicle and indicated he was going to get the kids. Although defendant got into his vehicle and began to drive away, he stopped twice, getting out of his own vehicle to threaten Harp or provoke him to fight. Eventually, both men made their way to the market, entering the parking lot one after the other and parking alongside one another.

Once at the market, Harp rolled down his window and told defendant he did not want him yelling at Zach and Hannah because they had done nothing wrong. Defendant began "doing this freaky thing again" getting out of his vehicle, so Harp got out of his own vehicle and stood near where the kids were seated on a bench in front of the market. Harp and defendant were face-to-face and there was yelling back and forth. Defendant continued to challenge Harp to a fight; Harp continued to yell at defendant that he should

2.

not yell at his children. Defendant then pointed his finger near Harp's face; Harp responded by pushing or slapping defendant's finger and hand away.

Harp told defendant to take his grandchildren and leave. He said it a few times. Defendant responded by wrapping his hands around Harp's neck. Harp's son Zach then stepped between Harp and defendant, releasing defendant's hold on Harp. Zach told defendant to "[g]et the F back." Defendant backed up and reached into his back pocket. Harp told Zach, "He's got a gun. Get back," as defendant pulled out a gun. It was pointed at Zach's stomach for a couple of seconds.

Before Harp could grab Zach, defendant raised and fired the gun. Initially, Harp did not know whether his son had been hit. Zach was not hit, but felt the "percussion of the bullet." Zach became upset and afraid for his family. He struck defendant's vehicle with his fists and told defendant if he was going to shoot anyone, to shoot him (Zach) versus his father.

Harp directed defendant to stay because he was calling the police. Defendant smiled and told Harp he was "going on home." Carolyn was crying. Defendant "yelled at [Carolyn] to get the F in the car," then he left the scene.

Police were called and Harp and his children waited for them to arrive. Tuolumne County Deputy Sheriff Victor Serrano responded to the call. Serrano took Harp's statement and photographed the marks and scratches evident on Harp's neck.

Later, Serrano, his supervisor, and a member of the California Highway Patrol went to defendant's home to continue the investigation. Initially defendant was cooperative, but he became agitated when Serrano asked about the gun and defendant's side of the story. Defendant got more upset and began calling the officers "every name under the sun," cussing and screaming. Defendant was taken into custody and advised of his constitutional rights. During transport to the jail facility, defendant told Serrano that he had "'finally lost it'" and "'fucked up today.'" He added that "nobody pushes [him] around." Although defendant refused to hand over the gun, Serrano learned a .25-caliber pistol was registered in defendant's name.

3.

*The defense case*

Defendant's granddaughter Carolyn and grandson Sean both testified in his defense.

Carolyn testified Zach knew she was not supposed to "hang out" with him. The morning of the incident, she left the house with Sean and went to meet Zach and Hannah. Later, while they were waiting to be picked up from the market by Zach's dad, her grandfather and Harp arrived. Harp got out of his car and was yelling at her grandfather. Her grandfather then pointed a finger at Harp and told her and Sean to get in the car. Harp slapped her grandfather's finger away and then Zach started going after her grandfather. Then her grandfather brought out his gun and put it up in the air. Zach began banging on her grandfather's car, leaving a dent. When her grandfather began to back away, Harp and Zach went after him. Carolyn heard the gun fire. She got into the car and left with her grandfather; he was angry with her because she had spent time with Zach.

On cross-examination, Carolyn testified she did not remember her grandfather choking Harp, nor did she remember telling an officer about it.

Sean testified he and Carolyn went to Zach and Hannah's house and spent some time there before leaving for the market. When it was time to go, Sean testified Carolyn called Zach's dad to get a ride. Eventually, his grandfather and Harp arrived, rushing into the parking lot. They began yelling at one another. Sean testified Harp pointed a finger at his grandfather and his grandfather got Harp's finger out of his face before doing the same. Harp started coming after his grandfather, then Zach stepped in, too. His grandfather backed away. The store clerk held Zach near the benches, yet Harp continued going after his grandfather. According to Sean, the store clerk held Zach back before the gun was fired.

Once the gun had been fired, Sean told Carolyn to get into the car and they left with their grandfather. On the drive back, his grandfather was yelling at both him and Carolyn; he was very mad. Sean testified he had never seen the videos from the market.

4.

On cross-examination, Sean indicated he and Carolyn told their grandfather they were going to Zach and Hannah's house and it was not a problem. Defendant just told them to "be back in a little bit." Sean did not remember Carolyn walking up to their grandfather's car when it arrived at the market, nor did he remember her running away from the car. He also did not remember his grandfather hitting or choking Harp. He claimed his grandfather just "nudged" Harp's face.

Defendant testified in his own defense. At the time of the incident, his 16-year-old granddaughter Carolyn and his 18-year-old grandson Anthony were living with him. His grandson Sean was visiting from Merced on the date of the incident.

That morning Carolyn and Sean left the house; defendant told them to be back in two hours. When they did not return as expected, he went looking for them. He knew Carolyn had been hanging out with a "20 year old"—meaning Zach—despite his direction that she not do so. He went right to the Harp residence as he had found Carolyn there once before.

When he arrived at Harp's home, Harp was leaving his driveway. Defendant rolled down his window and asked where his children were. Initially Harp would not tell him. He became angry and argued with Harp. He got out of his car once and approached Harp. Eventually, Harp told him where the kids were and defendant got in his car and headed down the hill toward the market. Defendant did not remember challenging Harp to fight. He did not get out of his car more than once.

As defendant was driving toward the market, he noted Harp was driving erratically and trying to tailgate him. Defendant sped up to avoid Harp and thought he might have to defend himself. Harp was right on his bumper and defendant was scared.

As he and Harp arrived at the market, defendant parked and started to get out of his vehicle. Harp rolled down his window and yelled at him. Defendant denied challenging Harp to a fight. Defendant did point his finger in Harp's face, "getting onto him about his 20-year-old son messing around with my 16-year-old granddaughter." Harp slapped his hand back. Defendant then grabbed Harp by the throat; Harp shoved

him back. Zach jumped in then and defendant backed up about 20 feet trying to avoid Harp and Zach. They were both shoving him and coming at him.

Defendant "hollered" at Harp and Zach to back off but they did not. He pulled the pistol out of his back pocket and fired a shot in the air before putting the pistol away. He never pointed the gun at anyone. Just before he fired the gun, defendant was afraid for his life and the lives of his grandchildren.

Harp and Zach started coming after defendant again and beating on his car hood. Defendant walked toward Zach and told him to "cut it out." While Zach was restrained, defendant found his grandchildren, put them in the car and left. He was "running the whole time from" Harp and Zach. Defendant went straight home. He did not hear Harp say he was going to call the police, and yet he did not call the police himself because he "knew they were going to get phoned."

Defendant initially cooperated with the law enforcement officers who arrived at his home later that day. However, when it became apparent they wanted to take away his guns, he refused to cooperate. Finally, defendant claimed no one got hurt that day.

On cross-examination, defendant admitted he does not have a concealed weapon permit and has never received firearms training. Defendant testified that when he told law enforcement he carries a gun with him at all times, he did not mean on his person. Rather, he meant he keeps it in his vehicle and the officer misunderstood him. Defendant denied having the pistol in his pocket when he approached Harp at Harp's home. It was in his car. Defendant put the pistol in his pocket as he slowed to make the turn into the market's parking lot.

Asked how pointing his finger in Harp's face would have deescalated the situation, particularly where defendant claimed to be afraid or scared, defendant responded that pointing his finger in Harp's face was better than taking a swing at him.

Defendant recalled telling law enforcement officers that he "'wasn't scared of those two,'" claiming he said so because he had already settled down somewhat. He agreed he was not afraid of Harp and Zach; he was mad at them. When he told officers,

"'I finally lost it. I know I fucked up today, but I don't care,'" he meant he felt it was right to get his grandchildren out of there and home safe. Defendant testified he said things he should not have said because he was upset, although calm, when speaking to the officers.

On redirect examination, defendant explained he did not tell law enforcement officers about going to Harp's house prior to the confrontation because he was not thinking about it. He also did not mention the ride between Harp's residence and the market, when Harp was tailgating him, because he was not asked about that period of time. Defendant cooperated with law enforcement until he was handcuffed and they began to ask him about his guns.

Finally, although he has had no formal training regarding firearms, defendant testified he has been around guns all his life.

### *The verdict and subsequent proceedings*

Following the jury trial, defendant was found guilty of all counts. On April 30, 2013, imposition of sentence was suspended and defendant was admitted to probation for a period of five years. He was also ordered to serve 60 days in jail and pay various fines and fees. Thereafter, defendant filed a timely notice of appeal.

## DISCUSSION

As we interpret defendant's opening brief, he makes a number of assertions in support of his argument that his conviction should be reversed because he used reasonable force to stand his ground and defend himself. More specifically, defendant contends: (1) the jury should have heard testimony about Zach's illegal drug use; (2) store clerk or owner Ahmad Aljamili should have testified; (3) he did not commit gross negligence; (4) he faced an imminent threat because Harp was 40 years old and Zach was 20 years old, thus they had the advantage of age, muscle and number of attackers; and (5) Harp made the "original physical contact." We will briefly address defendant's contentions, finding each lacks merit.

7.

*Zach's illegal drug use*

Defendant contends the trial court erred, in part, because it "would not allow evidence or testimony to be heard regarding Zachary Harp's illegal drug use."

Initially, we note defendant has failed to provide a citation to the record concerning the trial court's ruling in this regard, in violation of California Rules of Court, rules 8.204(a)(1)(C) and 8.360(a).

Nevertheless, our review of the record revealed the following brief exchange:

> "THE COURT:  Earlier today, during the voir dire process, I ruled on a motion in limine.  We had that discussion.

> "Do you recall that, [defendant]?  You asked me why I ruled as I did.  Do you remember that?

> "THE DEFENDANT:  Yes.

> "THE COURT:  The issue—the motion was to restrict any testimony with respect to the use of controlled substances by the two minors involved in this case, Mr. Zachary Harp and …

> "[DEFENSE COUNSEL]:  Carolyn.

> "THE DEFENDANT:  Carolyn.  She is my granddaughter.  [¶] … [¶]

> "THE COURT:  … [¶] I granted the motion, and I admonished [defendant] not to—during his testimony, not to raise the issue or discuss the issue of the use or possession of any controlled substances by the minors in this case, or anybody related to those minors.  And I am just putting that back on the record again."

The minute order of March 6, 2013, includes the following notation:  "District Attorney … presents motion that attorneys are not to ask any questions or offer evidence regarding drug use by defendant's granddaughter and victim.  Motion granted."

> "A ""'judgment or order of the lower court is *presumed correct*[, and a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.'" [Citation.]'  As this court has stated, 'we apply the general rule "that a trial court is presumed to have been aware of and followed the applicable law."' [Citation.]  'This rule derives in part from the presumption of Evidence Code section 664 "that official duty has been regularly performed,"' and thus when 'a statement of reasons is not required and the record is silent, a

8.

reviewing court will presume the trial court had a proper basis for a particular finding or order.' [Citation.]" (*In re Julian R*. (2009) 47 Cal.4th 487, 498-499.)

The record here is silent as to the reason the trial court excluded any testimony regarding the use of controlled substances by both Zach and Carolyn. As a result, we presume the court was aware of and followed the applicable law, and thus presume the court had a proper basis for excluding the testimony. (See, e.g., Evid. Code, § 352.) Therefore, we hold the trial court did not err by refusing to permit testimony concerning the use of controlled substances by Zach Harp.

### *Additional Witness Testimony*

Defendant contends that had "Ahmad Aljamili also known as 'Jimmy,' the store owner and store clerks" testified, his theory of self-defense would have been stronger.

Defendant has provided no citation to the record regarding any court ruling refusing to permit the testimony of these witnesses in the defense case. (Cal. Rules of Court, rules 8.204(a)(1)(C), 8.360(a).) Neither has defendant cited to any legal authority in support of his assertion. "'[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.'" (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Even treating the argument as though it had not been forfeited, our review of the record does not reveal any information in this regard. The record does not contain a defense witness list identifying Aljamili, for example. Neither does the record contain any ruling by the trial court wherein defendant was precluded from proffering such witness testimony. Hence, we will not presume the court erred. (*In re Julian R.*, *supra*, 47 Cal.4th at pp. 498-499.)

***Gross Negligence***

Defendant maintains he did not act with gross negligence by firing a gun into the air in the market parking lot. He relies upon *People v. Alonzo* (1993) 13 Cal.App.4th 535 in support of his argument.

To convict a defendant for violating Penal Code section 246.3, the jury must find that "(1) the defendant unlawfully discharged a firearm; (2) the defendant did so intentionally; [and] (3) the defendant did so in a grossly negligent manner which could result in the injury or death of a person." (*People v. Alonzo*, *supra*, 13 Cal.App.4th at p. 538.) Further,

> "[g]ross negligence, as a basis for criminal liability, requires a showing that the defendant's act was '"such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences."'" [Citation.] It is beyond dispute that shooting a gun in a commercial area where people are present constitutes gross negligence under this definition." (*Id.* at pp. 539-540.)

*Alonzo* does not help defendant's cause. In fact, it supports his conviction. Here, defendant discharged his firearm midday in the parking lot of a local market with a number of individuals present. At a minimum, four minors and one other adult— Carolyn, Sean, Zach, Hannah and Harp—were in the vicinity when he fired his weapon. That is sufficient evidence defendant's conduct was a departure from that of an ordinarily prudent person under the same circumstances so as to be incompatible with proper regard for human life. Furthermore, the fact the gun was pointed up in the air does not amount to a lack of gross negligence. That conduct—shooting up into the air—is the very conduct Penal Code section 246.3 seeks to deter. (*People v. Ramirez* (2009) 45 Cal.4th 980, 989-990.)

***Imminent Threat, Disparity of Age and Muscle, Initial Aggressor***

Defendant complains that he faced an imminent threat of bodily injury because he, a 72-year-old man, was facing "forty (40) and twenty (20) year old" men. As a result,

10.

"[a]ge, muscle and number of attackers would be considered an extreme threat for bodily injury." Defendant cites to *People v. Leslie* (1935) 9 Cal.App.2d 177 in support of his argument.

This matter is plainly distinguishable from *Leslie*. In that case, the trial court committed error by failing to instruct the jury on the law of self-defense. (*People v. Leslie*, *supra*, 9 Cal.App.2d at pp. 180-182.) Here, however, the jury was fully instructed on defendant's theory of self-defense. More specifically, the jury was instructed with CALCRIM Nos. 3470 (Right to Self-Defense), 3471 (Right to Self-Defense: Mutual Combat or Initial Aggressor), and 3472 (Right to Self-Defense: May Not Be Contrived).

Additionally, the jury had an opportunity to consider the age disparity as a result of defendant's own testimony, to wit: "I was in fear of my life and my grandkids' lives.… If they would beat me up, how would I have taken care of" them; "Well, hey, if I hadn't had something to protect myself, they would have probably beat me up and put me in the hospital"; "I'm 72 years old, buddy. They were 40 years old and 20 years old"; "I figured that I needed to protect myself because of my age." The jury fully considered the issue of age disparity as it related to any imminent threat.

In any event, to the degree defendant's argument on appeal can be interpreted to be a challenge to the sufficiency of the evidence, it, too, is unpersuasive.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is evidence that is "reasonable, credible, and of solid value." (*Johnson*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]" (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are

11.

functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Here, defendant's argument essentially asks this court to reweigh the evidence and reappraise the credibility of the prosecution witnesses in order to find in defendant's favor. This we will not do. (*People v. Culver*, *supra*, 10 Cal.3d at p. 548; *In re Frederick G.*, *supra*, 96 Cal.App.3d at p. 367.) In this case, there is abundant substantial evidence—reasonable, credible and of solid value—from which the jury could conclude defendant was not facing an imminent threat, and from which it could conclude defendant was not entitled to the right of self-defense given the circumstances. The jury, rather than this court, is tasked with resolving factual conflicts such as the one presented below.

There was substantial evidence that defendant was the aggressor: defendant himself testified he pointed his finger in Harp's face during a heated confrontation. Harp and his son Zach also testified defendant pointed his finger in Harp's face during the confrontation at the market. Defendant's act of pointing his finger in Harp's face was an initial act of physical aggression, triggering Harp's response of slapping defendant's hand away. Also, there was substantial evidence that, despite his testimony to the contrary, defendant was not afraid of Harp or Zach given his statements to that effect to law enforcement officials. Further, there was substantial evidence that would negate defendant's claim to the right of self-defense. For but one instance, defendant told Serrano on the way to the jail that he knew he had "fucked up." And, defendant himself testified during cross-examination that he told law enforcement officials he was not afraid; instead, he was angry at Harp and Zach. He also told Serrano that "'nobody pushes [him] around.'"

Reviewing the evidence in the light most favorable to the judgment, we conclude substantial evidence exists such that a reasonable trier of fact could find the essential elements of all four crimes of which defendant was convicted to be proven beyond a

reasonable doubt. (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578; *Jackson v. Virginia*, *supra*, 443 U.S. at p. 319.)

## DISPOSITION

The judgment is affirmed.