Filed 6/10/16  P. v. Vigil CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY VIGIL,<br><br>        Defendant and Appellant. | C074923<br><br>(Super. Ct. No. 11F06993) |

A jury found defendant Anthony Vigil guilty of the first degree murder of Michael Gonzales (Pen. Code, § 187, subd. (a))[1] and found true an allegation defendant personally discharged a firearm resulting in Gonzales's death (§ 12022.53, subd. (d)).  The trial court sentenced defendant to an aggregate term of 50 years to life in state prison,

---

[1] Further undesignated statutory references are to the Penal Code.

1

consisting of 25 years to life for Gonzales's murder, plus an additional 25 years to life for the firearm enhancement.

Defendant appeals, contending the trial court erred in denying his motion for substitute counsel. He also contends that the trial court made various evidentiary and instructional errors, the prosecutor committed misconduct in her closing argument, and defendant's trial counsel was ineffective in failing to object to portions of the prosecutor's closing argument. Finding no error or that any possible error was harmless, we shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.      The Prosecution

In July 2011 Jami Bryan's fiancé Michael Gonzales damaged the fender of his 2011 Dodge Challenger by striking a pole. Bryan's coworker Karl Hansen referred her and Gonzales to defendant, who owned and operated an auto body shop on Amalgam Way in Rancho Cordova. The shop was part of a cluster of six or seven warehouses. The warehouses shared a back parking lot area that was enclosed by a chain-link fence and accessible through a gate.

On August 21, 2011, Bryan accompanied Gonzales to drop off the car at defendant's shop. The repairs were supposed to take one week. The repairs were not completed within a week, and Gonzales had trouble getting in touch with defendant. Defendant's voice mail was full. He did not respond to text messages or emails, and when Gonzales went by defendant's shop, defendant was never there.

Bryan and Gonzales sought Hansen's help in contacting defendant. Hansen was aware that "disputes" had arisen between Gonzales and defendant over Gonzales's car. Hansen attempted to speak to defendant many times about the car. The first couple of times, defendant told him, "I'll take care of it." Thereafter, defendant politely told him, "Hey, just mind your business. It's between me and my client." At that point, Hansen

2

attempted to stay out of it. Defendant never told Hansen that Gonzales had threatened him or that he was afraid of Gonzales.

On the evening of September 20, 2011, Deputy Mark Kuzmich was dispatched to defendant's shop where he made contact with Chris Dunbar. Dunbar, who worked in the warehouse next to defendant's shop, told Kuzmich that he had seen two men enter defendant's shop and leave driving a gray Dodge. Kuzmich phoned defendant but was unable to leave a message because defendant's voice mailbox was full. Kuzmich left his contact information with Dunbar.

The next day, September 21, 2011, defendant contacted Kuzmich. Defendant told Kuzmich that the gray Dodge belonged to Gonzales, and that he believed that Gonzales had taken the car out the night before and then returned it to the shop. Defendant also claimed that $2,200 in cash was missing from his office and that Gonzales had been harassing him about the car. Kuzmich told defendant that he would take the initial burglary report and give it to a detective for follow-up. Kuzmich also explained that the issue concerning Gonzales's car was a civil matter between defendant and Gonzales. Defendant was not happy with Kuzmich's response; he wanted Kuzmich to arrest Gonzales. Defendant yelled obscenities at Kuzmich and demanded to speak to his superior. Kuzmich's supervisor, Sergeant James, later arrived and spoke to defendant. Kuzmich was not sure if he was part of the conversation between defendant and James, but he did recall that defendant was not happy when the conversation ended and as he walked away stated, "I'll handle it myself."

Kuzmich contacted Gonzales later that night. Gonzales confirmed that he had taken his car from defendant's shop and later returned it. He said that he had taken the car in to be repaired four weeks earlier and had not heard from defendant for the past nine days. He wanted to make sure that defendant was not "chopping [his] car up" for parts. He denied taking any cash from defendant's shop.

3

In the afternoon and early evening of October 6, 2011, Gonzales sent Hansen a series of texts requesting Hansen's help in contacting defendant and expressing frustration over defendant's refusal to communicate with him. Hansen called defendant and told him that Gonzales was looking for him and was upset.

That same evening, Gonzales dropped Bryan off at work. According to Bryan, Gonzales planned to meet defendant around 9:00 p.m. at his shop to pick up his car. Bryan spoke to Gonzales several times after he dropped her off, and each time Gonzales told her that he had not yet made contact with defendant. Eventually, Gonzales texted her that defendant had picked up the phone, and as far as she knew, Gonzales and defendant agreed to exchange the cash for the car that night.

Between 9:41 p.m. and 9:51 p.m., Gonzales sent Hansen a series of texts expressing frustration over defendant's failure to contact him. Hansen responded that he had called defendant twice on Gonzales's behalf and that the matter was "out of [Hansen's] hands."

At 9:53 p.m., defendant called Gonzales, and the two spoke for four minutes. At 9:58 p.m., defendant called Hansen and asked if Gonzales could drop the money off with Hansen at the club where Hansen worked, and if Hansen would then count the money and call defendant and confirm that it was all there. At that point, defendant would leave Gonzales's car by the curb so that Gonzales could pick it up. Defendant told Hansen that he did not want Gonzales at his shop but did not say anything about feeling frightened or being threatened.

Sometime prior to October 6, 2011, Donyale Davis was referred to defendant by a friend. Davis had trouble communicating with defendant and became frustrated when he perceived defendant was giving him "the runaround." Davis met Gonzales as he was leaving defendant's shop with his car. The two talked, and Davis learned that Gonzales was experiencing similar problems with defendant, and the two exchanged telephone numbers. Davis later asked Gonzales if he would serve defendant with paperwork related

4

to a small claims action Davis had initiated against defendant, and Gonzales agreed. As a party to the action, Davis could not serve defendant himself.

Davis arranged to meet Gonzales at defendant's shop on the night of October 6, 2011, to give Gonzales the papers he wanted served on defendant. He drove to the shop in his niece's car. When he arrived, the gate was open. He drove inside and parked next to Gonzales, who was already there. After parking his car, he closed the gate because he thought that defendant "wouldn't come to his business" if the gate was open. Davis did not want defendant to know they were there so they could "catch" him and Gonzales could serve him. Gonzales got into the passenger seat of Davis's car, and Davis gave him the paperwork he wanted served on defendant.

About 10 minutes later, defendant pulled up in his van and opened the gate. As he did so, Gonzales got out of Davis's car and began walking toward his own car. When defendant saw that there were people outside his shop, he got back into his van and started backing up. Afraid defendant would leave, Davis drove out of the driveway and toward defendant's van. Defendant stopped his van, and Davis stopped his car about two feet from the back passenger side of defendant's van. Davis denied attempting to block defendant but acknowledged that he intended to stop him. As Davis began to get out of his car he heard a gunshot nearby.

Telephone records showed a call from defendant to 911 at 10:03 p.m. A recording the call was played from the jury:

> "CHP: 911, what are you reporting?
>
> "[DEFENDANT]: Uh, I got people trespassing in my property.
>
> "CHP: Address?
>
> "[DEFENDANT]: Uh, uh, 11357, uh, Am -- 11357 Amalgam Way
> and Coloma Road.
>
> "CHP: What is your name?
>
> "[DEFENDANT]: Anthony Vigil.

5

"CHP:  And your phone number?

"[DEFENDANT]:  Hold on, I'm gonna shoot these fuckers if they keep --

"CHP:  No, what is your phone number?  Sir?

"[Sound of Gunshot]

"[END OF CALL]"

When Davis heard the gunshot, he got back in his car, drove down the street, and called 911 at 10:04 p.m.  At 10:06 p.m., another 911 call came in from a witness who reported that he saw two vehicles in the area and a person from one vehicle shoot at the other.

At 10:06 p.m., Sacramento County Sheriff's Sergeant Wayne Stephens was dispatched to 11358 Amalgam Way for "possible shot fired."

When Stephens arrived, defendant was standing next to a shotgun that was leaning against a building.  Gonzales was lying on the ground; he was dead.  Two envelopes containing a total of $2,640 in cash were found on Gonzales's body.  Other than defendant's shotgun, no other weapons were found at the scene.

The shotgun was a 12-guage with an extended magazine and the capacity to fire eight rounds.  Six expended cartridges were found at the scene, a live round was found in the chamber of the gun, and six more live cartridges were found in the magazine.

Detective Paul Belli, a homicide detective and firearms instructor with substantial experience investigating shooting scenes, explained that to fire the gun one would have pull the trigger then rack the gun to place a cartridge in the chamber from where it could be fired.  Because six expended cartridges were found at the scene and seven more were found inside the gun, defendant would have had to reload the gun at some point.  Based the pattern of bird shot around Gonzales's head, Belli opined that Gonzales was laying on the ground when one round was fired at him.

6

Gonzales was shot three times: once on the left side of his head; once in his lower face/upper chest; and once in his lower chest/upper abdomen. Any one of the wounds would have been fatal. Pathologist Gregory Rieber opined that Gonzales was standing when he was shot in his lower face/upper chest and lower chest/upper abdomen and had already fallen to the ground when he was shot in the left side of his head. Based on the "wadding marks" at the periphery of the shot patterns, Rieber opined that Gonzales was shot from a distance of 12 to 15 feet.

## B.    The Defense

Defendant testified in his own defense at trial. Defendant explained to Gonzales at the outset that because the car was brand new, parts were not readily available, and the front fender was being shipped from the East Coast.

In mid-September, Gonzales accused defendant of pocketing a check from the insurance company and not working on his car. He also accused defendant of not purchasing factory parts for his car. Defendant showed Gonzales the factory boxes and wrappers the parts came in. On another occasion, Gonzales told defendant that he did not trust him and accused defendant of driving around in his car. Defendant responded that he could not drive Gonzales's car because "[y]our whole front end is off the vehicle." Defendant told Gonzales, "[W]hen this vehicle is completely done, I need cash instead of a check."

On or about September 20, 2011, defendant received a call from Dunbar, who worked next door, informing him that defendant's shop had been broken into the night before, the door to the shop would not close, and the Challenger was gone. Defendant went directly to the shop. The Challenger was there, and the keys were on the hood of defendant's tow truck. The bumper, which had been resting on a saw horse waiting to be attached, was on the ground. When defendant went inside his shop, he discovered that $2,200 in cash was missing. He had kept the cash inside a cookie tin along with his customers' car keys.

7

Defendant spoke to Deputy Kuzmich who advised him that "there was not going to be an arrest or they weren't going to do anything about the situation." Defendant wanted an arrest to be made because his front door was damaged, a customer's car was taken out, the bumper was damaged, and "[a] lot of stuff had to be redone again." Defendant was frustrated and demanded to speak to Kuzmich's supervisor. Defendant told Sergeant James, "[T]his is why people break the law, [it's] because you let them get away with it." Defendant explained that Gonzales had "been calling me a pussy. He's intimidating me." James told defendant to call if Gonzales returned, and defendant responded, "Well, I'm going to have to protect myself." Defendant denied stating that he was going to take care of the situation himself.

After the incident, defendant called Gonzales and asked him why he broke into defendant's shop. Gonzales said he did not want to talk about it. Defendant told him that he intended to pursue the matter and would make sure Gonzales was arrested. Gonzales responded, "You'll get caught slipping. I have plenty of guns at my house." Defendant interpreted the term "slipping" to mean that defendant could not hide and that eventually Gonzales would get him. Defendant was "very afraid" and told Gonzales, "You are never allowed at my shop again. Don't ever call me. If you come by, you'll be trespassing." He also instructed Gonzales to have someone else handle his business.

Thereafter, defendant stopped going to the shop during the day. He worked in the evenings or at his customers' homes or businesses. He also started carrying his shotgun when he travelled from his residence to the shop. He bought the gun six years earlier for protection following break-ins at his business and home but had never fired it before the night in question.

Defendant told Hansen how upset he was about what was going on with Gonzales and that Gonzales had been threatening him. Hansen told defendant that Gonzales had been asking where defendant lived, and that Hansen was not going to tell him because he

8

did not "want any of this drama coming to the house." Defendant never told Hansen to mind his own business. To the contrary, they discussed the situation every day.

Defendant did not see Gonzales between September 19 and October 6, 2011. They communicated via text and cell phone.

Defendant testified that the outstanding issue was the final payment, explaining that Gonzales "would tell me he had the checks, and then he would say that, well, we're going to receive this check this date. Then he'd say he had all the money. [¶] Then I'd ask him what he had, and he wouldn't give me a full figure. [¶] Then he said he would let me know that he was still getting a check – he was still waiting on another check because the insurance company was still – they weren't doubling up the checks together. They were sending out the supplement separate, and they were sending out the first initial estimate separately."

On October 5, 2011, defendant texted Gonzales, "Mr. Gonzales, call when you cash check. I can send pic through e-mail if you like." That afternoon, Gonzales texted his email address to defendant, and that evening defendant attempted to email Gonzales a number of photographs of his car. Computer records revealed that defendant had mistyped Gonzales's email address, so defendant re-sent the photographs, and Gonzales responded at 12:25 a.m. on October 6, "COO," which defendant interpreted to mean "cool," and "[w]ish I could have just got a call back. So when can I get it?" A minute later, Gonzales asked defendant to call. Gonzales again texted defendant at 4:01 that morning, "Call me in the morning. All right. I got all the money. And now I believe you. The car is finally done. So call me early so I can get my car. Let's get it done first thing." Gonzales continued to text and call defendant throughout the day, and at 4:37 p.m., defendant texted Gonzales that he would call him later to take care of the car. Around 9:00 p.m., Gonzales texted defendant: "Man, you are a liar. What is your problem, Anthony Vigil? I want my car back. That's all. I'm over in the Tierra Vista area . . . ." That text bothered defendant because he knew that there was another person

9

named "Anthony Vigil" that lived on Tierra Vista Way in Sacramento, and assumed from Gonzales's text that Gonzales was searching for him and would eventually make his way to Hansen's house. At 9:29 p.m., Gonzales texted him, "So you have time to listen to the radio but don't have time to call me. Okay. You are in West Sac or maybe El Dorado Hills. You are trying to avoid me." Eight minutes later, Gonzales texted him, "Baseball, huh, what station." The texts "freaked . . . out" defendant because there was a baseball game on the television at Hansen's house, and defendant thought Gonzales was "right outside." At 9:52, defendant called Gonzales to "feel him out to see if he was in the area where we live . . . if he was upset, just diffuse the whole situation." Gonzales asked about picking up his car, and defendant told him that he was not allowed at the shop. Gonzales responded, "Well, if you don't want to meet me face-to-face we can duke this [out] at the club." Defendant told Gonzales that he would have to run it by Hansen first. Defendant called Hansen who agreed to allow Gonzales to drop the money off at the club and to call defendant once he had it so that defendant could leave Gonzales's car for Gonzales to pick up.

Defendant went to the shop to get the car ready. He planned to go over it with a duster and "Armor All" the tires. When he drove up the driveway to the shop, he saw that the gate was closed, which was not unusual. As he began to open the gate, he noticed two cars parked along the far wall, which was unusual because there were never any vehicles parked there. Defendant could not see very well because he was not wearing his glasses, but he could make out "the burgundy front end of [Gonzales's] vehicle." At that point, he closed the gate, dialed 911, jumped in his van, and started backing up. He was pretty sure the burgundy car belonged to Gonzales because he had seen it before. As he was talking to the 911 operator, a car "shot" past him and blocked his van. Defendant changed gears and prepared to go forward when he saw Gonzales standing in front of his van. Defendant stopped, stepped out of his van, and fired his

10

shotgun straight up in the air, hoping to scare anybody around him. Thereafter, Davis drove his car out of the driveway.

Next, Gonzales walked around the front of the van, and defendant asked him, "Michael, what are you doing here?" Gonzales responded, "You and [Davis] have other shit to deal with." Defendant had no idea what Gonzales was talking about or what was going on. He started walking backwards, trying to see where Davis's car was located. As he walked around the van, Gonzales closed defendant's driver's door and walked in the same direction. Defendant hurried toward the passenger side of his van and saw Gonzales "coming back up the driver's side . . . ." As Gonzales came around the front end of the van, he told defendant, "I told you I had guns." Defendant jogged backwards to get away from the "whole area" and asked Gonzales, "What are you doing here? What's going on? Why are you here?" Gonzales responded, "Well, come over here. Come over here." Defendant refused and told Gonzales, "Stay right there." Gonzales started coming close to defendant, so defendant aimed the shotgun at him, and he stopped. Defendant again asked Gonzales what he was doing there, and Gonzales again told defendant to "[c]ome over here." Over the next few minutes, defendant pleaded with Gonzales to remain calm. Defendant was concerned that there was another person in the area besides Gonzales. He wondered who was going to drive Gonzales's burgundy car home if Gonzales picked up his Challenger. Defendant asked Gonzales "to just take his car" and placed the keys on the hood of defendant's van. Gonzales said, "No." Defendant asked him to sit down so they could talk, and Gonzales said, "No." Defendant did not see a gun but believed Gonzales had one based on Gonzales's earlier statement, "I told you I had guns."

Defendant shot at Gonzales as Gonzales was coming at him. He did not believe the first shot hit Gonzales because Gonzales kept coming toward him. He fired the remaining shots at the ground in an attempt to avoid striking Gonzales. He could not see very well. He was "crying pretty heavily." He did not intend to hit Gonzales three times.

11

He wanted to scare Gonzales and hoped he would run away like Davis did. He stopped firing when he saw that Gonzales was on the ground. At that point, he knew he had hit Gonzales. He did not intend to kill anyone and was ashamed of what he had done. He reloaded the shotgun because he was still concerned that somebody else was in the area. When he shot at Gonzales he believed Gonzales was going to shoot or kill him.

Defendant suffers from an eye disease called keratoconus. Instead of being round, his eyeballs are shaped more like cones. In October 2011, he was supposed to be wearing hard contact lenses, but he did not wear them at the shop, only at home. Dr. Thomas Berard, a board certified ophthalmologist, confirmed that defendant suffers from keratoconus, a structural deformity of the cornea. Berard opined that with contact lenses, defendant's vision would be pretty good, but without them, defendant was legally blind in his right eye and had 20/50 vision in his left eye. Berard would be surprised if defendant would be able to recognize the face of a person sitting 40 feet away without corrective lenses.

## DISCUSSION

### I

### The Trial Court Did Not Abuse Its Discretion in Denying Defendant's *Marsden*[2] Motion

Defendant first contends that the trial court erred in denying his *Marsden* motion based on a breakdown in attorney-client communication, and as a result, he was denied effective assistance of counsel. Specifically, he claims that "[p]erishable evidence -- including tire marks on the curb which would have corroborated [his] claim that he tried to flee the scene before the shooting -- was not investigated or preserved" and "[o]ther evidence, including expert opinion that Gonzales used lethally threatening language -- 'caught slipping' -- was never offered." As we shall explain, defendant did not provide any substantial basis to justify substitution of counsel.

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

One week before trial was scheduled to commence, defendant informed the trial court that he did not believe that his trial counsel, Jan Karowsky, was properly investigating his case. In particular, he complained that Karowsky neglected to contact a linguistics expert to clarify the meaning of the phrase "caught slipping," which defendant believed constituted a threat. Defendant also complained that it took Karowsky over a year to understand that defendant had attempted to flee from the scene prior to the shooting, and that Karowsky failed to investigate a physical altercation between Bryan and Hansen's girlfriend following Gonzales's murder.

Karowsky informed the court that while he disagreed with defendant's complaints, defendant's perception of Karowsky's failings had resulted in an irreconcilable conflict. With respect to defendant's complaints, Karowsky explained that he had not consulted with a linguistics expert as to the meaning of the phrase "caught slipping" because he did not believe such evidence would be relevant, and in any event, there was a wealth of evidence showing that Gonzales had threatened defendant and that defendant was legitimately afraid. As for defendant's attempt to flee the scene, Karowsky explained that initially he did not understand defendant's point, but after reviewing photographs taken at the scene and speaking to defendant, he was able to understand it. With respect to the fight between Bryan and Hansen's girlfriend, Karowsky noted that the defense had interviewed the bouncer at the club, who was aware of the fight. However, because of the fight had occurred after the shooting, Karowsky did not believe it was relevant to the any issue at trial.

As for the purported conflict, Karowsky explained that while he had spent long periods of time discussing with defendant the reasons Karowsky did not do certain things and the reasons he did others, defendant disagreed with him and had "lost all trust and faith in [him] personally as his attorney and in [his] representation of [defendant's] best interests." Karowsky indicated that while he could effectively conduct most of the trial, he believed he would nevertheless be ineffective due to his inability to convince

13

defendant to testify, which Karowsky viewed as imperative. Karowsky attributed defendant's refusal to testify to defendant's loss of confidence in Karowsky. Karowsky explained that "with a bond of trust gone, I don't believe that he's willing to listen to my advice in the way he would if he still trusted and believed me. He's telling me now that he does not believe in me when I tell him he needs to testify to have a chance of winning or even obtaining a voluntary manslaughter on an imperfect self-defense" verdict.

The trial court responded that it had entertained multiple requests by Karowsky to continue the case based on a need to investigate, and in doing so, had reviewed declarations prepared by Karowsky documenting "the totality of [his] efforts to come prepared, [and] to fully respond to the nature of the charges." The court had been made aware of the retention of a variety of different experts, the status of those experts and their efforts to review the evidence, and Karowsky's contemplated strategies in terms of using both of those experts. Yet, "there was never, ever a point in any of those declarations where there was reference to a breakdown in communication between" Karowsky and defendant. The court also had trouble "understand[ing] the purported . . . loss of confidence" considering Karowsky's reputation, abilities, and experience, including what the court had observed in this case. The court observed that it did not "see the legitimacy for any basis other than sheer nerve, other than sheer concern over the possibility of this coming out poorly." The court took the matter under submission.

Three days later, when the court was scheduled to rule on defendant's motion, Karowsky advised the court that he had engaged in a lengthy discussion with defendant following the last hearing, and defendant continued to "vehemently disagree[]" with how Karowsky had and was investigating the case and his trial strategy. In addition, defendant informed Karowsky that he would not cooperate in any regard if Karowsky remained on the case. Karowsky again urged the trial court to appoint substitute counsel, arguing, "I think he's going to render me completely ineffective in every sense of the word, both constitutionally and pragmatically."

14

The trial court denied the motion. The court found "no evidence that counsel is constitutionally ineffective in his representation of the defendant." To the contrary, it found "that counsel who is well experienced in representation of defendants accused of murder, has fully prepared the case for trial, has more than adequately prepared both himself and the case for presentation and is neither deficient in his efforts or his abilities . . . ." The court found that Karowsky's concern over defendant's unwillingness to testify at trial was "premature at this current stage of the proceeding," and that any disagreement over whether defendant would testify fell within the category of a "tactical disagreement," which by itself did not constitute an irreconcilable conflict. The court explained that Karowsky was the "driver" when it came to tactical decisions and was entitled to direct the "vehicle in a fashion that his experience tells him . . . ." To the extent that there had been any deterioration in the relationship between Karowsky and defendant, the court concluded that it had "been occasioned solely by the defendant's willfully recalcitrant and defiant attitude."

"A *Marsden* motion is addressed to the discretion of the trial court, and a defendant bears a very heavy burden to prevail on such a motion." (*People v. Bills* (1995) 38 Cal.App.4th 953, 961.) The defendant must show that appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*People v. Valdez* (2004) 32 Cal.4th 73, 95 (*Valdez*).) A defendant who contends that his appointed counsel is not providing adequate representation must be permitted to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. (*Ibid.*) Denial of a motion for substitute counsel is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would " ' " 'substantially impair' " ' " his to assistance of counsel. (*Ibid.*)

" 'A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. [Citation.] Tactical

15

disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict." ' [Citation.]" (*Valdez, supra*, 32 Cal.4th at p. 95.)

It is clear from the record that the trial court afforded defendant the opportunity to explain the basis of his complaints and to relate specific instances of Karowsky's alleged inadequate performance. Defendant does not contend otherwise; rather, he acknowledges that "[a] complete *Marsden* hearing was held below." After hearing those complaints, the trial court allowed Karowsky to respond. Karowsky addressed defendant's specific concerns by describing what he had done in the case and maintained that he was prepared to go to trial. There is nothing in the record to support a finding that Karowsky was not adequately representing defendant. Rather, defendant's complaints were directed at tactical decisions made by Karowsky, and as our Supreme Court has observed, "When a defendant chooses to be represented by professional counsel, that counsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant." (*People v. Carpenter* (1997) 15 Cal.4th 312, 376.) The record amply supports the trial court's conclusion that Karowsky's representation was adequate and that there was no irreconcilable conflict between defendant and his counsel. There was no abuse of discretion.

II
The Trial Court Acted Within Its Discretion in Excluding Evidence Concerning an
Encounter Between Gonzales or Someone Acting at His Behest and an Individual With
the Same Name as Defendant

Defendant next contends that the trial court abused its discretion by excluding "evidence of contacts with and threats made to 'Anthony Vigil,' a person with the same name as [defendant]" because such evidence was "relevant to the credibility of [defendant's] testimony that he was in fear because he believed that Gonzales was stalking him." We discern no error.

Prior to trial, defendant moved in limine to introduce evidence that on the night of September 28, 2011, a man matching Gonzales's description went to the home of

16

Anthony Garfield Vigil on Tierra Vista Way looking for defendant. Although defendant was not aware of this encounter until after the shooting, he asserted that evidence "that Mr. Gonzales or someone at his behest had tried to locate [him] at [Anthony Garfield Vigil's] home and had frightened this person, is certainly relevant to demonstrate the lengths to which Mr. Gonzales was willing to go to harass, frighten, and intimidate defendant, in Gonzales' effort to get his car repaired and returned."

In his moving papers, defendant explained that he anticipated raising the defense of self-defense/imperfect self-defense at trial based in part on Gonzales's incessant cell phone calls and threatening text messages. In particular, defendant indicated that he would present evidence that on the night of the shooting, (1) Gonzales texted Hansen and asked him where defendant lived, (2) Gonzales texted defendant that he was "over here in the terra vista area waiting for u to call me," and (3) that defendant was aware that there was another person named Anthony Vigil that lived on Tierra Vista Way in Sacramento. Based on the above, defendant was afraid Gonzales was trying to surprise him at what he believed to be his home. Defendant further indicated that he would produce evidence that later that evening Gonzales texted him: "Sooo u have time to listen to the radio but u don't have time to call me . . . ," and, "Baseball huh what station." Defendant explained that these texts terrified him because at the time he was watching a baseball game on television and thought Gonzales was outside his home. Defendant argued that evidence that Gonzales went to the home of Anthony Garfield Vigil was relevant to establishing "an escalating pattern of words, threats, and conduct which has a tendency in reason to prove or disprove . . . that defendant acted in self-defense or imperfect self-defense."

The People opposed the motion, arguing that evidence of an encounter between Gonzales and Anthony Garfield Vigil was not relevant because defendant was unaware of the encounter when he shot Gonzales, and thus, it was impossible for defendant's "state of mind to have been affected by the evidence offered through the proposed testimony." The People also asserted that any probative value the evidence might have was

17

" 'substantially outweighed by the probability that its admission will . . . create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury,' " noting that the evidence was in conflict as to whether Anthony Vigil Garfield was " 'afraid for his life' " when confronted by Gonzales, as defendant claimed.

The trial court ruled that the testimony of Anthony Garfield Vigil concerning his encounter with a man resembling Gonzales on September 28, 2011, was inadmissible because it was not relevant and was likely to confuse the issues. The court reasoned, "I think the critical factor is the fact that [defendant] knew nothing about it. [¶] Had [defendant] been aware, obviously, there are exceptions that would permit it in, but it's clear from your motion that he was completely unaware of the circumstances that existed and doesn't describe a pattern at all. What it describes is, I suppose, conceding the fact that it is [Gonzales] that did this, I think that's [a] reasonable inference it indicates [Gonzales] was trying to locate [defendant], and when another person that happened to have the same name, and engaged in what was not a particularly remarkable discussion with him about whether he was this particular person, and he was not. [¶] So I would exclude it not only as not being relevant to the proceedings here, but also under [Evidence Code section] 352 as being more confusing of the issues."

"No evidence is admissible except relevant evidence," and "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, §§ 350, 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.,* § 210.)

"A trial court has broad discretion to exclude relevant evidence under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citations.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.) "We review rulings

18

regarding relevancy and Evidence Code section 352 under an abuse of discretion standard." (*Ibid.*)

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation]." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082, fn. omitted.) "Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .' [Citation.]" (*Id.* at pp. 1082-1083.)

The trial court acted within its discretion in excluding evidence that Gonzales went to the home of Anthony Garfield Vigil looking for defendant because defendant had no knowledge of the encounter when he shot Gonzales. As detailed above, in determining whether a defendant acted in either self-defense or imperfect self-defense, the focus is on the *defendant's* belief in the need to defend. (*People v. Humphrey, supra,* 13 Cal.4th at pp. 1082-1083.) To the extent defendant was not aware of the encounter between Gonzales and Anthony Garfield Vigil at the time of the shooting, the trial court acted within its discretion in determining that evidence of the encounter was not relevant.

The trial court likewise acted within its discretion in determining that any probative value such evidence may have had was substantially outweighed by the probability it would confuse the issues. According to the police report submitted by defendant in support of his motion, Anthony Garfield Vigil told police that the man who came to his home " 'had a wild look about him' " and that he (Anthony Garfield Vigil) was " 'afraid for his life.' " According to a report prepared by defendant's own investigator, however, Anthony Garfield Vigil stated that the man who approached him

19

"was polite, not pushy" and "spoke very loud." He also denied telling police that he feared for his life, stating: "I did not tell him I feared for my life. What I told the officer was that I was concerned for my safety. Again, this had more to do with the setting of the encounter rather than something the subject said." Given the conflicting evidence, there was a strong probability that the evidence defendant sought to present, which concerned a collateral issue, would not only confuse the issues but would consume an undue amount of time. Under these circumstances, the trial court did not abuse its discretion in excluding it.

On appeal, defendant claims for the first time that the testimony of Anthony Garfield Vigil was relevant to corroborate defendant's testimony that he was in imminent fear at the time he fired the shots, and the trial court's exclusion of such evidence was prejudicial because defendant's "credibility was central to the case." Defendant failed to make this argument in the trial court, and as result, forfeited his claim on appeal. (Evid. Code, § 354, subd. (a).)

### III
#### Any Error in Failing to Sua Sponte Instruct the Jury that Provocation in the Form of a Sudden Quarrel or Heat of Passion May Reduce Murder to Manslaughter Was Harmless

Defendant next contends that the trial court erred in failing to instruct the jury that provocation in the form of a sudden quarrel or heat of passion may reduce murder to manslaughter. As we shall explain, any error in failing to so instruct the jury was harmless under any standard because the jury necessarily rejected the possibility that defendant acted in the heat of passion by convicting him of first degree murder.

The jury was instructed under CALCRIM No. 505 that defendant was not guilty of murder or manslaughter if he acted reasonably in self-defense and under CALCRIM No. 571 that he was guilty of the lesser included offense of voluntary manslaughter if he acted unreasonably in self-defense. It was also instructed under CALCRIM No. 521 that defendant was guilty of first degree murder as opposed to second degree murder if "he

20

acted willfully, deliberately and with premeditation. The defendant acted willfully if he intended to kill. *The defendant acted deliberately if he carefully weighed the considerations for and against his choice and knowing the consequences decided to kill.* The defendant acted with premeditation if he decided to kill before completing the act that caused death. [¶] . . . A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated." (Italics added.) The trial court was not asked to and did not instruct the jury pursuant to CALCRIM No. 570 that provocation in the form of a sudden quarrel or heat of passion may reduce murder to manslaughter.[3]

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) "A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without

---

[3] CALCRIM No. 570 provides in part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

deliberation and reflection, and from such passion rather than from judgment." ' " (*Ibid.*, fn. omitted.)

A trial court has the duty "to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149.) We need not determine whether the trial court erred in failing to instruct the jury that provocation in the form of a sudden quarrel or heat of passion may reduce murder to manslaughter because any error was harmless under any standard.

Here, the jury was instructed that it could not return a verdict of first degree murder unless it found that defendant "carefully weighed the considerations for and against his choice and knowing the consequences decided to kill." "[S]uch a finding 'is manifestly inconsistent with having acted under the heat of passion.' " (*People v. Peau* (2015) 236 Cal.App.4th 823, 831 (*Peau*), quoting *People v. Wharton* (1991) 53 Cal.3d 522, 572; see also *People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) Because the jury necessarily found that Gonzales's murder was willful, deliberate, and premeditated, we conclude that any error in failing to give a heat of passion instruction was harmless beyond a reasonable doubt. (*People v. Lewis* (2001) 25 Cal.4th 610, 646 ["Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions."].)

## IV
### The Trial Court Did Not Err in Failing to Sua Sponte Instruct the Jury on Defense of Property

Defendant contends that the trial court erred in failing to instruct the jury in the language of CALCRIM No. 3476, which states that the owner or possessor of real or

personal property may use reasonable force to protect that property from imminent harm.[4] We disagree.

It is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense if the defendant is relying on it or there is substantial evidence supporting it, and it is not inconsistent with the defendant's theory of the case. (*People v. Anderson* (2011) 51 Cal.4th 989, 996-997.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .' [Citations.]" (*People v. Salas* (2006) 37 Cal.4th 967, 982-983.) Thus, whether the trial court in this case erred in not instructing the jury on defendant's right to defend his property turns on whether defendant was relying on that theory or offered substantial evidence that, if believed by the jury, would raise a reasonable doubt as to whether Gonzales's homicide was justified. As we shall explain, defendant was not relying on such a defense, and there is no substantial evidence to support it.

The defense argued that defendant's use of force was justified because defendant, not his property, was in imminent danger of being harmed. During his closing argument,

---

[4] CALCRIM No. 3476 provides in pertinent part: "The owner [or possessor] of (real/ [or] personal) property may use reasonable force to protect that property from imminent harm. . . . [¶] *Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to protect the property from imminent harm. [¶] When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable to protect property from imminent harm. If the People have not met this burden, you must find the defendant not guilty of _____ *<insert crime>*."

defendant's trial counsel told the jury, "Mr. Vigil reasonably believed his life was in danger."

Moreover, the record does not support a finding that defendant used reasonable force against Gonzales to protect his property. Defendant intentionally shot Gonzales with a shotgun. No juror reasonably could conclude such force was reasonable under the circumstances. (See *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360 ["the intentional use of deadly force merely to protect property is never reasonable"].)

Finally, any possible error was harmless. As previously discussed, the trial court instructed the jury on reasonable self-defense with CALCRIM No. 505. This instruction informed the jury that defendant was not guilty of manslaughter or murder if (1) he reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; (2) he reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and (3) he used no more force than was reasonably necessary to defend against that danger. The instruction also stated that the prosecution had the burden of establishing that defendant did not act in self-defense. After receiving the instructions, the jury returned a first degree murder verdict. Thus, the jury necessarily found one or more of the elements of self-defense was lacking.

Ultimately, then, defendant's argument for prejudice from the failure to give the defense of property instruction rests on the premise that the jury could have found that defendant acted in reasonable defense of his property in shooting Gonzales even though it found that he did not act in reasonable self-defense in protecting his person. This argument is fundamentally flawed. "[I]t is . . . clear that a person has no greater rights in defense of his property than he does of his life." (*People v. Smith* (1967) 249 Cal.App.2d 395, 402.)

For all the foregoing reasons, defendant's claim that he was prejudiced by the trial court's failure to instruct the jury on defense of property fails.

24

# V
## The Trial Court Properly Responded to the Defense's Objection to the Prosecutor's Misstatement of the Evidence, and the Misstatement Did Not Rise to the Level of Misconduct

Defendant contends that the trial court erred in failing to sustain a defense objection to the prosecution's misstatement during closing argument that defendant admitted telling Sergeant James, "I'll handle it myself," and that the statement constituted misconduct. As we shall explain, the trial court properly admonished the jury that the statements of counsel are not evidence, and on the record before us, the prosecutor's technical misstatement did not constitute misconduct.

As detailed above, Deputy Kuzmich testified that on September 20, 2011, he responded to a report of a possible burglary at defendant's shop. Defendant became unhappy when Kuzmich refused to arrest Gonzales and demanded to speak to his superior. Following his conversation with Sergeant James, defendant stormed away and said, "I'll handle it myself."

At trial, defendant denied making that statement. He testified that when James advised him that Gonzales was not going to be arrested, he said, "I'm going to have to protect myself," and James responded, "You do what you got to do." More particularly, the following colloquy took place during the prosecutor's cross-examination of defendant:

> "Q: You say that under no circumstances did you make the statement that Deputy Kuzmich testified to where he put in his report, If they weren't going to arrest Michael, you would handle it yourself. Your testimony is that you never said anything like that?
>
> "A: Never.
>
> "Q: You know that that statement makes you look very bad, doesn't it?

25

"[DEFENDANT'S TRIAL COUNSEL]: Object. That's argumentative.

"THE COURT: Overruled.

"Q: Looking back on it, having shot and killed Michael, shot him three times and killed him on October 6th, you know that if you made that statement 15 days earlier, that looks very bad for you, doesn't it?

"A: It would if I made the statement, I didn't make that statement. I told you what I told the officer."

During her closing argument, the prosecutor stated: "Whether or not the defendant actually made that statement . . . I'll handle it myself, that's of most concern, [defendant's trial counsel] said and, of course, it is, it should be, right, because that is a statement of intent, and they both know, certainly, *the defendant testified that is a very harmful statement that he made*. It shows his state of mind towards Michael Gonzales. [¶] And it is one of animosity." (Italics added.)

Defendant's trial counsel objected, asserting, "He didn't admit to saying that." Without ruling on the objection, the trial court admonished the jury: "Folks, as I've indicated previously, if the attorneys are talking, you are not receiving evidence. It's their interpretation, their memory of the evidence too. If your memory of the evidence is different, you are to rely on your memories. That['s] why -- I'm not inviting you, by the way, to have this case read back. Mary will shoot me if I did. But if you need something in particular read back, we can give that to you. But these are the attorney[s'] arguments."

The prosecutor then continued, "I think I will invite you, if you need to, to have Mary read this back to you, because, in fact, his client did admit that if he made that statement to Deputy Kuzmich on the 21st of September, it would be very, very harmful to him."

26

" ' " 'A prosecutor's conduct violates the Fourteenth Amendment . . . when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct . . . that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury . . . ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " ' " (*People v. Adams* (2014) 60 Cal.4th 541, 568 (*Adams*).)

Here, the trial court properly responded to defense counsel's objection by admonishing the jury that the statements of counsel are not evidence and that the jury was entitled to have the testimony read back to them if needed. That the trial court did not sustain the objection is of no consequence. The trial court was not required to make a determination as to what the evidence showed. As for the statement itself, while the prosecutor technically misspoke when she stated that "the defendant testified that is a very harmful statement that he made," we find that when the statement is considered in context and in light of the trial court's admonition, there is no reasonable likelihood the jury construed the remark in an objectionable fashion. (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [we must view the statements to which the defendant objects in the context of the argument as a whole].) The prosecutor began her argument by stating, "*Whether or not* the defendant actually make that statement," appearing to acknowledge that defendant denied making it. (Italics added.) Then, following the trial court's admonition that the statements of counsel are not evidence, the prosecutor clarified that "*if* [defendant] made that statement . . . , it would be very, very harmful to him." (Italics added.) On this record, there is no reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.

27

## VI

### Defendant Forfeited His Claim Concerning Additional Statements Made by the Prosecutor During Closing Argument by Failing to Object Below, and in Any Event, the Statements Were Harmless

Finally, defendant claims the prosecutor prejudicially erred by attacking the validity of the doctrine of imperfect self-defense during her closing argument. As we shall explain, defendant forfeited his claim by failing to object to the challenged statements below, and even if it had been preserved, we find the comments were harmless.

During his closing argument, defendant's trial counsel urged the jury to find defendant guilty of voluntary manslaughter based on the doctrine of imperfect self-defense. In her rebuttal argument, the prosecutor asserted: "And I would imagine that you might be sitting there after the argument and thinking, Wow, is that the law, really? You mean somebody can go out and shoot and kill somebody and they get a pass because they can say they were afraid, even if it's totally unreasonable and nobody would find it to be reasonable? That just sounds incredible, right? Well, it is. It's not credible. [¶] There is self-defense and there is an imperfect self-defense. And that's a judicially created defense by the Supreme Court of California under Rose Bird a number of years ago. It is so rare because it's not common sense. You have to look at somebody who you know is a liar and you have to believe their statement that they are fearful when there is no evidence to support that. [¶] Now, if that's all it took to get a finding of imperfect self-defense and voluntary manslaughter, well, you would be seeing a whole lot of murders now on a voluntary manslaughter conviction, wouldn't you? That's pretty easy to do. You come in and you say, Oh, no, I was afraid. I know it's unreasonable, but I was afraid. How are you going to prove I wasn't? I said, I was, believe me, I'm an honest person."

"[I]n order to preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection to the alleged misconduct and request the jury

28

be admonished to disregard it." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1339.) Defendant acknowledges his failure to object to the prosecutor's comments but argues that he should be excused from complying with this basic precondition to appeal because an objection would have been futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820-821.) We disagree.

This case is similar to *Peau, supra,* 236 Cal.App.4th at pages 833-834, where the prosecutor characterized the doctrine of imperfect self-defense as a " 'loophole,' " and *People v. Najera* (2006) 138 Cal.App.4th 212, 220 (*Najera*), where the prosecutor characterized voluntary manslaughter as a " 'legal fiction.' " In both cases, the court determined that the prosecutors' statements were improper, but nevertheless concluded that the defendants forfeited their claims by failing to object below because the trial court could have corrected the misleading or inaccurate statements and instructed the prosecutors not to repeat them. (*Peau, supra,* 236 Cal.App.4th at p. 834; *Najera, supra,* 138 Cal.App.4th at pp. 220-221, 224.) The same is true here

Finally, even if defendant had preserved this claim, we would reject it. While the prosecutor's comments questioning the logic and legitimacy of the doctrine of imperfect self-defense were improper, we conclude they were harmless. The jury was instructed (1) to find defendant guilty of voluntary manslaughter, and not murder, if it concluded he acted in imperfect self-defense, (2) to follow the law as explained by the trial court, not counsel, and (3) that closing arguments are not evidence. Under the circumstances of this case, we conclude that there is no reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. Given our conclusion that the challenged statements were harmless, defendant's contention that his trial court was ineffective for failing to object likewise fails. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

29

# DISPOSITION

The judgment is affirmed.

                                   /s/

                                Blease, Acting P. J.

I concur:

     /s/

     Hull, J.

I concur in the result:

     /s/

     Murray, J.